UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ANIMAL WELFARE INSTITUTE; and
WILDLIFE PRESERVES, INC.,

        Plaintiffs,

        v.

K. CHRISTOPHER SOLLER, in his official
capacity as Superintendent of FIRE ISLAND
NATIONAL SEASHORE, and the UNITED
STATES NATIONAL PARK SERVICE, an
agency of the U.S. Department of the Interior,

        Defendants.

Civil Action No.: 17-cv-6952

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiffs Animal Welfare Institute ("AWI") and Wildlife Preserves, Inc. ("Wildlife Preserves"), by and through their undersigned attorney, bring this action against K. Christopher Soller ("Soller"), in his official capacity as Superintendent of Fire Island National Seashore Park ("FINS"), and the United States National Park Service ("NPS" and together with Soller, "Defendants"), an agency of the U.S. Department of the Interior, as follows:

## I.    PARTIES

### A.    Plaintiffs

1.    AWI is a non-profit animal advocacy organization with its principal place of business at 900 Pennsylvania Ave., SE, Washington DC, 20003. Since its founding in 1951, AWI's mission has been to end human-inflicted animal suffering and exploitation by vigorously defending animals' interests through the law. AWI has a longstanding and well-established interest in protecting the lives and habitats of wildlife from harassment, encroachment, and destruction.

AWI's wildlife advocacy department works diligently to protect all wildlife, flora, and fauna, including deer. AWI has over 40,000 members worldwide, including members in New York, on Long Island, and that reside in one or more of the communities on FINS. The aesthetic, recreational, scientific, and educational interests of AWI's members have been and will continue to be adversely affected and irreparably injured if Defendants continue to affirmatively implement the action that Plaintiffs challenge with this litigation. The killing of white-tailed deer on FINS by sharpshooting, public hunting, and capture and euthanasia will interfere with AWI's members' use and enjoyment of public lands and ecosystems in FINS. AWI's members derive aesthetic, spiritual, recreational, and educational benefits from observing wildlife and their habitats. Those members, including members who live in the communities on FINS, have concrete plans to continue to travel to and/or recreate in areas in FINS that will be affected by implementation of the NPS wildlife management plan that is the subject of this litigation. AWI's injuries are actual, concrete, particularized injuries caused by Defendants' failure to comply with mandatory duties under federal laws. These injuries would be redressed by the relief sought.

2.     Wildlife Preserves is a private, non-profit land conservation corporation with its principal place of business at 336 Whippany Road, Whippany, New Jersey 07981. Wildlife Preserves is dedicated to the preservation of natural areas, open space, wildlife, and wildlife habitats for conservation, education, and research. Wildlife Preserves' property rights have been violated by NPS's failure to abide by deed restrictions on a portion of FINS.

**B.**     **Defendants**

3.     Soller is being sued in his official capacity as the Superintendent of FINS with a principal place of business at 120 Laurel St. Patchogue, New York 11772. Soller is responsible for managing all FINS programs and operations, including the plan at issue in this litigation.

4.     NPS is an agency of the Department of the Interior with its offices at 1849 C Street NW, Washington, DC. 20240. NPS was created by the Congress of the United States of America to preserve unimpaired the natural and cultural resources and values of the National Parks for the enjoyment, education, and inspiration for this and future generations. NPS manages FINS and its wildlife, including deer.

## II.     JURISDICTION AND VENUE

### A.     Jurisdiction

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

### B.     Venue

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims herein occurred within this district and this case includes a challenge of the Defendants' activities in this judicial district.

7.     Venue is also proper in this jurisdiction over the subject matter of this action pursuant to N.Y. Const. Art. 6 §7.

## III.     LEGAL BACKGROUND

### A.     National Environmental Policy Act

8.     The National Environmental Policy Act, 42 U.S.C. § 4321-4370h ("NEPA"), "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Congress enacted NEPA in 1969, directing all federal agencies to assess the environmental impacts of proposed actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C).

9.     The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA that are binding on all federal agencies. 40 C.F.R. § 1500–1518.4. Agency

actions taken pursuant to NEPA are reviewable by this Court under the APA, 5 U.S.C. §§ 702, 704.

10.    NEPA's primary purposes are to ensure fully informed decision-making and to provide for public participation in environmental analyses and decision-making. *Id.* at §§ 1500.1(b), (c). NEPA obligates the agency to make available to the public high-quality information, which must be subject to accurate scientific analyses, expert agency comments, and public comments, before decisions are made and actions are taken. 40 C.F.R. § 1500.1(b).

11.    Under NEPA, an Environmental Impact Statement ("EIS") must be prepared for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Agencies are required to engage the public to determine the "scope of issues to be addressed [in an EIS] and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7. The "scope" of an EIS is based on the range of actions, alternatives (*i.e.*, no action, reasonable alternatives, and mitigation measures), and impacts (*i.e.*, direct, indirect, and cumulative). Actions include: "connected actions," which are closely related and, therefore, should be discussed in the same EIS; "cumulative impacts," which in combination with other actions have cumulatively significant impacts; and "similar actions," which have similarities with other reasonably foreseeable or proposed actions that warrant evaluating their environmental consequences together. 40 C.F.R. § 1508.25.

12.    One of NEPA's fundamental goals is to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. The scope of NEPA review is quite broad, including the consideration of all reasonable alternatives, 40 C.F.R. § 1502.14(a), and direct, indirect and cumulative effects on "ecological . . . aesthetic, historic, cultural, economic, social, or health" interests. 40 C.F.R. §

1508.8. NEPA requires adequate disclosure of all such impacts. The NEPA documentation must provide the decision-maker and the public with adequate information, evidence, and analyses to fully assess the potential impacts of the proposed actions. *Id.* at § 1502.1.

13.     The requirement to evaluate all reasonable alternatives is not simply procedural; the CEQ has stated that the alternatives analysis is "the heart" of the NEPA analysis. 40 C.F.R. § 1502.14; *see also* 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1507.2(d). The federal agency must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated;" "[d]evote substantial treatment to each alternative considered in detail including the proposed action;" and "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14(a)–(c).

14.     To satisfy NEPA's "hard look" requirement, a federal agency must present the environmental impacts of the proposed action and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among the options by the decision maker and the public. 40 C.F.R. § 1502.14. Because the purpose and need statement required by 40 C.F.R § 1502.13 defines the scope of reasonable alternatives, an agency may not narrowly construe the purpose and need so as to define away competing reasonable alternatives and foreclose consideration of a reasonable range of alternatives.

15.     An adequate analysis of the environmental impacts of a project also must include a consideration of the direct, indirect, and cumulative impacts of the project resulting from all past, present and reasonably foreseeable future actions. 40 C.F.R. §§ 1508.7, 1508.8, 1508.25(c). Direct effects are "caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects are "caused by the action and are later in time or farther removed in distance, but

are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Cumulative impacts are the impacts on the environment that result from incremental impacts of the action when added to other past, present and reasonably foreseeable future actions, regardless of what agency or person undertakes such other actions. 40 C.F.R. §§ 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions." 40 C.F.R. § 1508.7.

16.   A Record of Decision under NEPA is a final agency action subject to judicial review.

## B.       Administrative Procedure Act

17.   The Administrative Procedure Act, 5 U.S.C. §§ 701–706, authorizes courts to review final agency actions and hold unlawful and set aside final agency actions, findings, and conclusions that are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The APA also authorizes a reviewing court to compel agency action that is unlawfully withheld. 5 U.S.C. § 706(1). The APA provides a cause of action to challenge any final agency action taken pursuant to any statute where the action is made reviewable by that statute, or where there is no other adequate remedy in a court. 5 U.S.C. § 704.

## C.       The National Park Service Organic Act Implements Regulations, Policies, And Enables Legislation for FINS.

18.   The NPS was created in 1918 through the promulgation of the National Park Service Organic Act (39 Stat. 535, 16 U.S.C. § 1, "NPS Organic Act"). This act established that the purpose of the NPS is to "promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified, except such as are under the jurisdiction of the Secretary of the Army, as provided by law, by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve

6

the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." In 2016, with the promulgation of the National Park Service Centennial Act, the purpose was restated to say that the NPS "shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101. With regard to the management of wildlife within units of the NPS, "The Secretary may provide for the destruction of such animals and plant life as may be detrimental to the use of any System unit." 54 U.S.C. § 100752.

19.     Sport hunting of wildlife in national parks is not permitted unless it is explicitly permitted in the enabling legislation or proclamation creating the national park unit. The enabling legislation for FINS permits hunting but only upon promulgation of relevant regulations. Specifically, the enabling legislation authorizes the Secretary to "permit hunting, fishing, and shell-fishing on lands and waters under his administrative jurisdiction within the Fire Island National Seashore in accordance with the laws of New York and the United States of America, except that the Secretary may designate zones where, and establish periods when, no hunting shall be permitted for reasons of public safety, administration, or public use and enjoyment. Any regulations of the Secretary under this Section shall be issued after consultation with the Conservation Department of the State of New York." Pub L. 88-587.

20.     The NPS has promulgated regulations to supplement the requirements imposed by the NPS Organic Act. NPS regulations regarding wildlife protection and management are limited.

In general, the possession, destruction, injury, removal, or disturbance of live wildlife from its natural state is prohibited. 36 C.F.R. § 2.1. The feeding, teasing, frightening, or intentional disturbance of park wildlife is also prohibited. 36 C.F.R § 2.2(a)(2). Hunting in national parks is also prohibited except where it is specifically mandated by federal statutory law. 36 C.F.R § 2.2(b). To permit hunting in any national park where hunting is specifically authorized, the superintendent of the park must determine that it is consistent with public safety and enjoyment, sounds resource management principles, and is only allowed pursuant to special regulations. 36 C.F.R § 2.2(b)(2).

21.     In 2006, the NPS adopted management policies to guide management of national parks. The policies are not legally enforceable but they must be followed by NPS personnel unless a waiver is granted. The policies provide guidance for the management and conservation of natural resources, cultural resources, planning processes, visitor use management, education and interpretation, fire management, soundscape protection, wilderness management, law enforcement and for many other programs of the NPS. The NPS relies extensively on the policies regarding biological resource management in the FINS deer management EIS.

**D.     Enforcement Of Deed Restrictions**

22.     As more fully discussed below, Wildlife Preserves conveyed land to Sunken Forest Preserve, Inc. ("Sunken Forest Preserve"), which, in turn, conveyed the land to the NPS.  Both of the deeds for these transactions included valid and enforceable restrictions, which prohibited certain actions on the land.  Where the intent of parties is clear and the restriction is not offensive to public policy, deed restrictions (also called restrictive covenants) are fully enforceable in New York. *See, e.g. Getchal v. Lawrence*, 121 Misc. 359, 201 N.Y.S. 121 (Sup 1923); *Blue Island Development, LLC v. Town of Hempstead*, 131 A.D.3d 497, 15 N.Y.S.3d 807 (2d Dep't 2015); *J.J. Cassone Bakery, Inc. v. Neri's Land Imp., LLC*, 65 A.D.3d 1288, 886 N.Y.S.2d 739 (2d Dep't

2009); *Forest Hills Gardens Corp. v. 150 Greenway Terrace, LLC*, 37 A.D.3d 759, 830 N.Y.S.2d

581 (2d Dep't 2007); *Forest Hills Gardens Corp. v. Evan*, 12 A.D.3d 563, 786 N.Y.S.2d 70 (2d

Dep't 2004); *Chambers v. Old Stone Hill Road Associates*, 1 N.Y.3d 424, 774 N.Y.S.2d 866, 806

N.E.2d 979 (2004).

23.     Deed restrictions limiting the use of property have consistently been recognized as

valid and enforceable both in law and in equity in New York State. *Id.*

24.     A wide-range of deed restrictions have been deemed enforceable in New York,

including restrictions requiring that property remain in its "natural state." *Nature Conservancy v.*

*Congel*, 296 A.D.2d 840, 744 N.Y.S.2d 281 (4th Dep't 2002).

## IV.     FACTUAL ALLEGATIONS

**A.     Wildlife Preserves Conveys Land But Imposes Strict Deed Restrictions That Would
Result In Reversion Of Ownership If Violated.**

25.     On June 29, 1955, Wildlife Preserves conveyed multiple tracts of property ("WP

Tracts") to Sunken Forest Preserve. The WP Tracts make up a substantial portion of what is known

as the Sunken Forest Preserve within the Fire Island National Seashore Park, in Suffolk County,

New York.

26.     The deed conveying the WP Tracts (the "1955 Deed"), contained a restriction that

the property was to be maintained in its natural state and used as a wildlife sanctuary. Specifically,

the 1955 Deed provided:

> This conveyance is made subject to the express condition and limitation
> that the premises herein conveyed **shall be maintained in their natural
> state and operated as a preserve for the maintenance of wildlife and
> its natural habitat** undisturbed by hunting, trapping, fishing or any other
> activity that might adversely affect the environment or the animal
> population, and for scientific and educational purposes incidental to such
> maintenance and operation. Should the premises cease to be used solely
> for the above purposes, or **should any activities be engaged thereon that
> would, adversely affect the flora or the fauna then the title of the**

> **grantee shall cease and determine and shall revert and vest in the grantor**, the said reversion and vesting to be automatic and not requiring any re-entry (emphasis added).

27.     On May 9, 1966, Sunken Forest Preserve conveyed the WP Tracts, as well as a separate parcel, to NPS via deed (the "1966 Deed").

28.     Sunken Forest Preserve was a not for profit organization that was dissolved in 1968.

29.     The 1966 Deed included the same restrictions as the 1955 deed. In particular, the 1966 Deed states:

> All of the premises shall **always be maintained in their natural state and operated solely as a sanctuary and preserve for the maintenance of wild life and its natural habitat**, undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the flora or fauna of said premises; and for scientific and educational purposes incidental to such maintenance and operation (emphasis added).

## B.      NPS Undertakes A NEPA Review.

30.     On June 17, 2011, NPS published a notice in the Federal Register announcing its intent to prepare an EIS for a "Deer and Vegetation Management Plan" for FINS (76 Fed. Reg. 35467).

31.     In concert with this notice, NPS/FINS, in summer 2011, published its Newsletter #1 entitled "White-tailed Deer and Vegetation Management Plan / Environmental Impact Statement" to promote the public scoping process.

32.     In fall 2012, NPS/FINS published Newsletter #2 also entitled "White-tailed Deer and Vegetation Management Plan / Environmental Impact Statement" as a planning process update.

33.     Newsletter #3 was published in December 2013 providing another update to the planning process. It had the same title as Newsletters #1 and #2.

34.    On August 11, 2014, NPS published a notice in the Federal Register announcing the availability of a Draft Environmental Impact Statement ("DEIS") for the White-tailed Deer Management Plan, Fire Island National Seashore, New York (79 Fed. Reg. 46874).

35.    In the DEIS, NPS indicated that its preferred management plan was to fence a section of the WP Tracts to exclude deer within that fence and to reduce the deer population overall through a combination of sharpshooting, capture and euthanasia of individual deer, and public hunting ("Alternative D").

36.    NPS accepted public comment on the DEIS until October 10, 2014. NPS received 1631 comments on the DEIS. Of the 1610 actual comments, an overwhelming number opposed lethal control.  In particular, 1,442 opposed lethal control, 107 supported lethal control, 11 state no position, and 50 did not clearly identify a position.

37.    Notice of availability of the Final White-Tailed Deer Management Plan and Environmental Impact Statement ("FEIS"), Fire Island National Seashore, New York was published on December 31, 2015 (80 Fed. Reg. 81856).

38.    In April 2016, FINS issued a Record of Decision ("ROD") for the Fire Island National Seashore ("FINS") White-Tailed Deer Management Plan and Final Environmental Impact Statement (the "Plan").

39.    Despite the fact that the public comments overwhelmingly opposed lethal control of the deer, the Plan approved the killing of deer on the WP Tracts, as well as other areas of FINS by: a) sharpshooting; b) capture and euthanasia, where sharpshooting would not be safe; and c) public deer hunting. Immunocontraception is to be used after the deer population is reduced to some predetermined level via lethal control. The FEIS justifies the need for a reduction in deer

numbers due primarily to alleged deer impacts to FINS vegetation and to address reported deer-human conflicts.

40.     NPS further authorized an exclusion fence to be erected around 44 acres of maritime holly, much of which is contained in the WP Tracts. Contrary to the deed restrictions, which provide that the WP Tracts must be maintained in their natural state and would be a protected sanctuary, however, deer would be driven out of the fenced-in area and any deer found within the fence would be removed by direct reduction such as sharpshooting or capture and euthanasia.

**C.     NPS Breached The Deed Restrictions, Causing The WP Tracts To Revert To Wildlife Preserves.**

41.     The WP Tracts and other lands that comprise the Sunken Forest Preserve were granted to NPS under the explicit condition that they "be maintained in their natural state and operated as a preserve for the maintenance of wildlife and its natural habitat" (the 1955 deed) and "always be maintained in their natural state and operated solely as a sanctuary and preserve for the maintenance of wildlife and its natural habitat" (the 1966 deed).

42.     NPS violated these deed restrictions when it authorized, through the Plan, the killing of white-tailed deer by hunting, sharpshooting, or through capture and euthanasia.  In addition, NPS violated the deed restrictions by authorizing the fencing in which deer would be driven out of the fenced-in area and any deer found within would be killed.

43.     The clear terms of the 1955 deed state that "should any activities be engaged thereon that would, adversely affect the flora or the fauna then the title of the grantee shall cease and determine and shall revert and vest in the grantor."

44.     The Plan calls for killing and driving deer out of fenced-in areas, which "adversely affects the fauna" on the WP Tracts. Thus, the Plan violates the deed restriction and title to the WP Tracts reverted to Wildlife Preserves.

**D.     Defendants Admit That The WP Tracts Carry The Deed Restrictions.**

45.     As a result of NPS's violation of the deed restrictions, on February 3, 2016, Ms. Anita Austenberg Shotwell, Vice President and Managing Trustee of Wildlife Preserves, wrote a letter to Defendant Soller, expressing concern about the Plan and informing NPS that the Plan violates the deed restrictions.  NPS failed to respond to this communication.

46.     As a result, on May 31, 2016, Ms. Shotwell wrote another letter to Michael Caldwell, Regional Director of NPS again expressing concern about the Plan, informing NPS that the Plan violates the deed restrictions and sought NPS's cooperation to avoid litigation.  Ms. Shotwell requested that Mr. Caldwell meet Wildlife Preserves to discuss ways to limit the prohibited actions.  NPS again failed to respond to this communication.

47.     Thereafter, on June 27, 2016, counsel for Wildlife Preserves wrote yet another letter to Mr. Caldwell, following up on Ms. Shotwell's letter, and requesting a meeting to discuss the deed restrictions in an effort to avoid litigation.

48.     Seven months after Wildlife Preserves' first correspondence to NPS, on September 1, 2016, Defendant Soller finally responded to Wildlife Preserves.  In the letter, Defendant Soller acknowledged that the WP Tracts carry the deed restrictions "originated by Wildlife Preserves[.]" Defendant Soller, however, took the position that the Plan does not violate the deed restrictions. Specifically, Defendant Soller stated:

> [a]s there are no natural predators on Fire Island to keep the deer population in check their numbers have grown exponentially since the Sunken Forest Preserve was donated to the Service.  This has resulted in heavy browsing that is adversely affecting the flora and fauna of the Sunken Forest.  Managing Fire Island's deer

herd is a key factor to ensuring the preservation of the Sunken Forest as a globally-rare ecosystem and as a preserve for all wildlife and the natural habitat of the Sunken Forest.

49.     Thus, Defendant Soller reasoned that it was acceptable for NPS to reduce the number of deer on the WP Tracts by killing, sharpshooting, trapping, euthanasia, etc.—even in violation of the deed restrictions—in order to keep the deer population under control.

50.     This reasoning specifically violates the deed restrictions.  The WP Tracts were granted to NPS under the explicit restriction that the land "shall be maintained in their natural state and operated as a preserve for the maintenance of wildlife and its natural habitat undisturbed by hunting, trapping, fishing or any other activity that might adversely affect the environment or the animal population."  Defendants' actions clearly disturb the natural state of the land and adversely affect the animal population by, among other things, a specific act prohibited in the deed—hunting.

**E.     NPS Is In Breach Of The National Environmental Protection Act.**

51.     The NPS has failed to comply with the requirements of NEPA in its preparation of the FINS FEIS and ROD for its white-tailed deer management plan. Specifically, the NPS/FINS has:

a.   failed to properly define the scope of the EIS by segmenting deer management from vegetation management contrary to its original intent thereby failing to consider all connected, similar, and cumulative actions;

b.   failed to disclose all relevant data and information for the public's consideration and review including, but not limited to, a substantive plan for the protection of cultural resources, an assessment of impairment/unacceptable impacts, data on invasive species, the minimum requirements analysis, evidence of other natural and

anthropogenic threats to FINS resources other than deer; and data to substantiate alleged impacts of deer on FINS vegetation and other wildlife;

c. failed to subject its fertility control vaccine criteria to public review;

d. failed to identify the legal basis for engaging in the killing of deer on FINS;

e. failed to substantiate the purpose and need for deer management particularly lethal deer management;

f. failed to consider a reasonable range of alternatives;

g. failed to include objective and quantifiable metrics to adequately distinguish between the impacts of the preferred alternative and other alternatives, and;

h. failed to fully evaluate the cumulative impacts of each alternative.

52. To survive an APA challenge, an agency must have "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" PPL Wallingford Energy LLC v. FERC, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. 29, at 43). Merely articulating the facts found and the choice made is insufficient without also providing an adequate rationale connecting the two.

53. Public comments to NPS's DEIS overwhelmingly opposed the killing of deer. NPS, however, failed to consider nonlethal alternative actions in their ROD for the control of the white-tailed deer population.

54. In addition, NPS failed to consider an alternative method for reducing human contact to address the concerns with overly socialized deer.

55. Indeed, NPS did not satisfy NEPA's "hard look" requirement in evaluating reasonable alternatives to lethal population control methods.

# V.      CLAIMS

## FIRST CLAIM FOR RELIEF
### *Declaratory Judgment*

56.     Plaintiffs incorporate all allegations in the preceding paragraphs into this claim.

57.     NPS is aware of the deed restrictions placed on the WP Tracts in the 1955 Deed and the 1966 Deed requiring that the WP Tracts revert to Wildlife Preserves should the NPS engage in any activities that would adversely affect the flora or the fauna.

58.     NPS authorized the killing of white-tailed deer on the WP Tracts and the fencing of the WP Tracts in violation of the deed restrictions.

59.     As a result, the WP Tracts immediately revert to Wildlife Preserves because of the reversion clauses in the 1955 deed and the 1966 deed.

60.     Accordingly, Plaintiffs respectfully request a Declaratory Judgment from the Court that the Plan violates the deed restrictions and the WP Tracts immediately reverted to Wildlife Preserves as a result of enactment of the Plan.  In addition, Plaintiffs respectfully request that the Court order Defendants to execute a deed for the WP Tracts in favor of Wildlife Preserves.

## SECOND CLAIM FOR RELIEF
### *Ejectment/Action to Recover Possession of Real Property*

61.      Plaintiffs incorporate all allegations in the preceding paragraphs into this claim.

62.     The 1955 Deed and 1966 Deed contain deed restrictions that require the WP Tracts to "be maintained in their natural state and operated as a preserve for the maintenance of wildlife and its natural habitat" (the 1955 deed) and "always be maintained in their natural state and operated solely as a sanctuary and preserve for the maintenance of wildlife and its natural habitat" (the 1966 deed).

63.     In addition, the 1955 Deed and the 1966 Deed state that the WP Tracts will immediately revert to Wildlife Preserves should the NPS engage in any activities that would adversely affect the flora or the fauna.

64.     NPS is in possession of the WP Tracts as a result of the 1966 Deed.

65.     NPS authorized the killing of white-tailed deer within the WP Tracts and the fencing of the WP Tracts in violation of the restrictions in the 1955 Deed and the 1966 Deed.

66.     As a result of NPS's violation of the deed restrictions in the 1955 Deed and the 1966 Deed, the WP Tracts must revert to Wildlife Preserves.

67.     Accordingly, Plaintiffs respectfully request that the Court eject NPS from the WP Tracts, allow Wildlife Preserves to recover possession of the WP Tracts and order Defendants to execute a deed for the WP Tracts in favor of Wildlife Preserves, its successors and assigns.

## THIRD CLAIM FOR RELIEF
### *Permanent Injunction*

68.     Plaintiffs incorporate all allegations in the preceding paragraphs into this claim.

69.     The 1955 Deed and the 1966 Deed contain deed restrictions that require the WP Tracts to "be maintained in their natural state and operated as a preserve for the maintenance of wildlife and its natural habitat" (the 1955 deed) and "always be maintained in their natural state and operated solely as a sanctuary and preserve for the maintenance of wildlife and its natural habitat" (the 1966 deed).

70.     In addition, the 1955 Deed and the 1966 Deed state that the WP Tracts will immediately revert to Wildlife Preserves should the NPS engage in any activities that would adversely affect the flora or the fauna.

71.     NPS is in possession of the WP Tracts as a result of the 1966 Deed.

72.     NPS authorized the killing of white-tailed deer within the WP Tracts and the fencing of the WP Tracts in violation of the restrictions in the 1955 Deed and the 1966 Deed.

73.     Serious and irreparable harm will result absent an injunction stopping the Plan because if the NPS begins implementing the Plan, it will kill deer on the WP Tracts and erect a fence on the WP Tracts in violation of the deed restrictions.

74.     The equities are in Plaintiffs' favor because, among other reasons, there are other options available to the NPS to deal with the issues purportedly caused by the deer on the WP Tracts.

75.     Plaintiffs have no adequate remedy at law.

76.     Accordingly, Plaintiffs respectfully request that the Court rule that the Plan violates the deed restrictions on the WP Tracts and order that the NPS is prohibited from executing the Plan on the WP Tracts.

### FOURTH CLAIM FOR RELIEF
*Administrative Procedure Act/National Environmental Policy Act*
*Failure to consider all reasonable alternatives*

77.     Plaintiffs incorporate all allegations in the preceding paragraphs into this claim.

78.     The APA provides that the "reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) & (D). When a court determines that an agency's decision was unlawful under the APA, vacatur is the standard remedy.

79.     In addition, under the APA the district courts retain their "broad latitude in fashioning equitable relief when necessary to remedy an established wrong," including the

discretion to impose conditions on remand. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 937 (9th Cir. 2008).

80.    NEPA requires governmental agencies to provide an environmental impact statement, which provides all necessary information to demonstrate that the agency has taken a "hard look" at the environmental consequences in relation to its proposed action.

81.    NPS did not satisfy NEPA's "hard look" or other requirements in preparing the EIS by failing to: consider a reasonable range of alternatives to lethal population control methods, properly define the scope of the EIS, disclose all relevant information for public consideration, include objective and quantifiable criteria to clearly distinguish between the impacts of the preferred alternative and other alternatives, and to otherwise meet the requirements of NEPA.

82.    Accordingly, the ROD and the EIS set forth by the NPS must be set aside pursuant to the Administrative Procedure Act as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

## FIFTH CLAIM FOR RELIEF
### *NPS Organic Act, implementing regulations, and policies*

83.    Plaintiffs incorporate all allegations in the preceding paragraphs into this claim.

84.    NPS has failed to identify the legal authority under which it will engage in the wholesale killing of deer on FINS.

85.    NPS has also failed to satisfy the statutory requirements to permit lethal control of deer on FINS via hunting, sharpshooting, or capture and euthanasia.

86.    Accordingly, the NPS decision to permit the lethal control of deer in FINS violates the Organic Act and its implementing regulations.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, based upon the allegations in the foregoing paragraphs, Plaintiffs pray that this Court:

1. Declare that the WP Tracts reverted to Wildlife Preserves at the time the Plan was enacted;

2. Eject NPS from the WP Tracts;

3. Allow Wildlife Preserves to recover possession of the WP Tracts;

4.  Order Defendants to execute a deed for the WP Tracts in favor of Wildlife Preserves, its successors and assigns;

5. Grant a permanent injunction prohibiting NPS from executing the Plan on the WP Tracts.

6. Declare the ROD and the EIS approving the culling of deer on the WP Tracts to be in violation of NEPA and the Organic Act;

7. Award Plaintiffs' reasonable costs, including attorney's fees, incurred to bring this action, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

8. Grant Plaintiffs' such other and further relief as may be necessary and proper.

Dated:  November 29, 2017                         **MEYNER AND LANDIS LLP**

<u>/s/ Catherine Pastrikos Kelly</u>

By:    Catherine Pastrikos Kelly, Esq.
       90 Park Avenue, 17th Floor
       New York, New York 10016
       973-602-3423 (t)
       973-624-0356 (f)
       ckelly@meyner.com

*Attorneys for Plaintiffs*
*Animal Welfare Institute, Inc. and*
*Wildlife Preserves, Inc.*