FILED
CLERK
2:14 pm, Feb 26, 2019
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ANIMAL WELFARE INSTITUTE and
WILDLIFE PRESERVES, INC.,

                                  Plaintiffs,　　　　　**MEMORANDUM & ORDER**
                                                      17-CV-6952 (SJF)(ARL)

      v.

ALEXCY ROMERO, in his official capacity as
Superintendent of FIRE ISLAND NATIONAL
SEASHORE, and the UNITED STATES NATIONAL
PARK SERVICE, an agency of the United States
Department of the Interior,

                                  Defendants.
----------------------------------------------------------------X
FEUERSTEIN, District Judge:

      Plaintiffs Animal Welfare Institute and Wildlife Preserves, Inc. (collectively, "Plaintiffs") commenced this action against the Superintendent of the Fire Island National Seashore Park ("FINS") and the United States National Park Service ("NPS") (collectively "Defendants") claiming *inter alia,* that the FINS White-Tailed Deer Management Plan and Final Environmental Impact Statement (the "Plan") adopted by the NPS does not satisfy the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §4321 *et seq*.

      Currently before the Court is Plaintiffs' motion pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction preventing Defendants from commencing implementation of part of the Plan that directs the killing or culling of deer at the William Floyd Estate, Motion, Docket Entry ("DE") [37], the first phase of which is set to occur from February 20 through March 31, 2019. Plaintiffs further seek an order enforcing a purported agreement between counsel that no deer would be killed, culled, or hunted during the pendency of this litigation. By order dated February 19, 2019, the Court granted Plaintiffs' a temporary

restraining order ("TRO"). Defendants were given an opportunity to respond to the motion, and a hearing was held on February 21, 2019. For the reasons set forth below, the motion is denied in its entirety.

## I. BACKGROUND

### A. Factual Background

The recitation of facts is limited to those factual allegations pertinent to the motion currently before the Court. In June 2011, the NPS announced its intent to prepare an environmental impact study ("EIS") for a plan to manage deer and vegetation at FINS. Amended Complaint ("Am. Compl.") ¶32. A draft EIS was published in 2014, after which NPS accepted public comment. *Id.* ¶33, 35. The final EIS was published on December 31, 2015, *id.* ¶35, and in April 2016, FINS issued a Record of Decision ("ROD") of the FINS White-Tailed Deer Management Plan and Final Environmental Impact Statement (the "Plan"). *Id.* ¶37.

According to the ROD, it was determined that deer posed a threat to native vegetation, and that browsing by deer at the William Floyd Estate is "resulting in the degradation of elements of the cultural landscape." Declaration of James H. Knapp ("Knapp Decl."), ExA., ROD at 16. In addition, the "high concentration of deer at the William Floyd Estate also contributes to the perceived risk of tick-borne diseases, which may affect visitation at the site," and the habituation of deer to humans has resulted in human-deer interactions that "raise the risk of injury to people and deer and increase the likelihood of property damage by deer." *Id.* The Plan Objectives as to William Floyd Estate included "manage deer browse to allow for the restoration and preservation of the cultural landscape of the William Floyd Estate and for the regeneration of the forest within the lower acreage of the William Floyd Estate." *Id.* The Plan

calls for a combination of lethal and nonlethal means "to reduce and maintain deer density at a target level of approximately 20-25 deer per square mile." *Id.* at 5.

On February 11, 2019, the NPS issued a Press Release entitled "National Park Service to Begin Deer Management at William Floyd Estate" announcing that removal actions would be implemented from February 20 through March 31, 2019 at the William Floyd Estate. Declaration of Catherine Pastrikos Kelly ("Kelly Decl."), Ex 5. ("Press Release"). It stated that the removal operations would be carried out "over a period of at least two years to achieve a deer density of approximately 20 to 25 deer per square mile." *Id.* The Frequently Asked Questions addendum to the Press Release states that the removal operations would occur at the William Floyd Estate while it is closed to the public and would be implemented only by federal employees who are "highly qualified firearm experts experienced in conducting removal operations within lands adjacent to a suburban environment." *Id.*

**B. Procedural History**

Plaintiffs commenced this action on November 29, 2017, and filed an Amended Complaint on April, 10, 2018. They assert five (5) causes of action, two (2) of which are at issue on this motion.[1] The Fourth Claim asserts that NPS' decision was arbitrary or capricious and did not satisfy NEPA by failing *inter alia,* to consider a reasonable range of alternatives to lethal population control methods. Am. Compl., ¶¶76-81. In the Fifth Claim, Plaintiffs allege that the NPS decision violates its Organic Act by failing to satisfy statutory requirements to allow lethal control of deer by hunting, sharpshooting, or capture and euthanasia. *Id.* ¶¶82-85. Defendants'

---

[1] Plaintiffs' First, Second, and Third Claims pertain to whether deed restrictions placed on the lands known as Sunken Forest require that title of that property revert to plaintiff Wildlife Preserves, Inc.

motion to dismiss the Amended Complaint was submitted on November 18, 2018 and is *sub judice.*

1. Parties' agreement regarding Defendants' extension of time to answer

After the original complaint was filed, counsel for both parties engaged in communications regarding Defendants' request for an extension of time to file an answer. In an email dated February 5, 2018, Plaintiffs' counsel Catherine P. Kelly ("Kelly") wrote the following to Assistant United States Attorney James Knapp ("Knapp"):

> Our clients agree to extend defendants' deadline to answer the complaint to March 30. In return, you confirmed that the White Tailed Deer Management Plan (the "Plan") at issue will not be enacted in so far as deer will not be killed, culled or hunted through the duration of the litigation. In addition you agree that the fence around Sunken Forest as contemplated by the Plan will not be erected until at least September 18, 2018.
>
> Please include this language in any letter you submit to the Court on this issue.

Kelly Decl., Ex. 1. Knapp subsequently filed a request of extension of time to answer with the Court, noting Defendants' consent. Letter, DE [14]. After putting forth the reasons for the extension request, the letter states that "[i]n addition, the undersigned has advised Plaintiffs' counsel that the National Park Service will not begin implementing the culling of deer during the pendency of this action or erect fencing around the Sunken Forest through at least September 30, 2018." *Id.* Magistrate Judge Anne Y. Shields granted the request for an extension of time to answer without reference to either the removal of deer while this action is pending or the erection of fencing. *See* Elec. Order of 2/6/18.

2. Current motion

On February 15, 2019, Plaintiffs moved for a TRO and a preliminary injunction. This Court granted the request for a TRO, and a hearing on the motion was held on February 21,

2019. The motion seeks to halt the planned removal operations under two theories: (1) enforcement of the agreement that deer would not be killed, culled or hunted during the pendency of this litigation; and (2) issuance of a preliminary injunction to halt Defendants from taking action "to implement the Plan on the William Floyd Estate, a unit of the Fire Island National Seashore, is so far as that implementation would involve the killing, culling, or hunting of deer." *See* Motion, DE [37].

In support of their motion, Plaintiffs provide a declaration from John DiLeonardo, a member of the Animal Welfare Institute. Declaration of John DiLeonardo ("DiLeonardo Decl.") at ¶2, DE [38]. He states generally that he enjoys "observing and photographing deer in the wild including on Long Island." *Id.* ¶7. Regarding the William Floyd Estate, he states that he has visited the site, plans to return this year, and has a "particular interest in visiting. . . to observe wildlife, including deer. *Id.* ¶10. Indeed, the "opportunity to see deer" is the "primary reason" he visits the William Floyd Estate. *Id.* ¶13. The harm DiLeonardo anticipates suffering if the removal operations under the Plan proceed is set forth as follows:

> This killing, if allowed, will grievously harm my ability to enjoy future visits to William Floyd Estate by reducing the deer population, thereby diminishing my opportunities to observe and photograph deer on estate grounds. If the deer are killed, visiting William Floyd Estate would be like visiting a graveyard for wildlife; a place where I will know that just weeks or months earlier the deer that I cherish were slaughtered. Given the potential for large numbers of deer (perhaps more than 60-70) in a single year to be killed leaving only a few dozen survivors, there is no question that my opportunity to see deer on William Floyd Estate – the primary reason I visit the estate – would be unalterably impaired.
>
> Not only would killing the deer reduce my opportunities to see deer on estate grounds, because of their smaller numbers but it would impair my ability to enjoy the surviving deer. Unlike deer in other areas that are subject to annual hunting seasons, deer on William Floyd Estate have been protected for decades, making

> them less skittish and less likely to flee in the presence of humans. This provides me with opportunities to observe and photograph deer up close when visiting the estate; opportunities that would be lost to me during my nest visit to William Floyd estate if the killing is allowed [to] proceed this winter.

*Id.* ¶13.

Although DiLeonardo attests generally to "deer that I cherish" at the site, he does not state a connection with any particular deer the lethal removal of which would cause him emotional harm. He states that he "strongly oppose[s] the killing of deer" in general, and that the "decision by the NPS to kill deer is horrible and not what I expect from this agency." DiLeoardo Decl. ¶¶ 7, 9. He opposes the decision to use "lethal control" as it is "cruel, ineffective, and won't solve the perceived problem." *Id.* ¶12.

## II. MOTION TO ENFORCE AGREEMENT

Plaintiffs argue that the communications between counsel in February 2018 leading to Defendants' extension of time to answer constituted a valid, binding agreement between the parties that Defendants would not implement the Plan during the pendency of this litigation. They ask the Court to enforce this agreement and, on that basis, order that no deer be killed, culled, or hunted while this case remains open. The authority cited by Plaintiffs involves enforcement of settlement agreements; they have provided no support whatsoever for the proposition that agreements made between counsel regarding the procedure of a case should be treated as valid, enforceable agreements. The wisdom of a policy that would apply the rules of contract to routine agreements made between counsel during ongoing litigation is questionable.

Moreover, there is no indication that the Court was aware of, let alone approved, any purported agreement, a situation that may have warranted a different result, albeit for a different reason. Defense counsel's letter to Magistrate Judge Shields stated that he "advised" plaintiff's

counsel, suggesting that this was a unilateral decision on the part of the Defendants, not an agreement for the Court to acknowledge in some way. At no time was the "agreement" placed on the record before the Court, nor did the parties enter into a stipulation that was filed with, or approved by, the Court.

Plaintiffs' counsel undoubtedly maintains a sincerely held belief that the parties had an agreement that the Plan would not be implemented during this litigation. Under the circumstances presented, however, there is no support for a finding that there was an enforceable agreement between the parties.

## III. MOTION FOR A PRELIMINARY INJUNCTION

### A. Legal Standards

"In general, district courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Otoe–Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (internal quotation marks and citation omitted); *see also Central Rabbinical Congress of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014) (accord). However, where a plaintiff "seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous ['serious questions'] standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, n.4 (2d Cir. 2010) (internal quotation marks and citation

7

omitted) (alteration in original). "This exception reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Otoe–Missouria Tribe*, 769 F.3d at 110 (quoting *Able v. United States,* 44 F.3d 128, 131 (2d Cir. 1995)).

Accordingly, in order to obtain a preliminary injunction, Plaintiffs must show that they are likely to succeed on the merits of their claims. *See Nat'l Audubon Soc., Inc. v. U.S. Fish & Wildlife Serv.*, 55 F. Supp. 3d 316, 349–50 (E.D.N.Y. 2014) ("the Court must be sure that, in all likelihood, defendants have acted unlawfully before substituting its judgment for that of the political branches"); *see also Pres. Coal. of Erie Cnty. v. Fed. Transit Admin.*, 129 F. Supp.2 d 551, 564 (W.D.N.Y.2000) (in a case involving NEPA, plaintiff must show irreparable injury and a likelihood of success on the merits).

## B. Discussion

### 1. Likelihood of Success on the Merits

Plaintiffs argue that they are likely to prevail on the merits of both their claim of a violation of NEPA and of the Organic Act.

#### a. NEPA violation

The purpose of NEPA is "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." 42 U.S.C. §4321. NEPA is considered the country's "basic national charter for protection of the environment." 40 C.F.R.

8

§1500.1(a). It establishes policy and sets goals, and its implementing regulations explain to "federal agencies what they must do to comply with the procedures and achieve the goals of the Act." *Id.* An agency considering "major Federal actions significantly affecting the quality of the human environment" is required to prepare a detailed environmental impact statement. 42 U.S.C. §4332(C).

NEPA does not "mandate particular results," but rather "imposes only procedural requirements to ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 23, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) (internal quotation marks and citation omitted); *see also Stewart Park & Reserve Coal, Inc. (SPARC) v. Slater,* 352 F.3d 545, 557 (2d Cir. 2003) ("NEPA does not command an agency to favor any particular course of action, but rather requires the agency to withhold its decision to proceed with an action until it has taken a 'hard look' at the environmental consequences." In reviewing an EIS, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 97-98, 103 S. Ct. 2246, 76 L. Ed. 2d 437 (1983).

Plaintiffs claim that NEPA was violated for two reasons. First, NPS failed to satisfy NEPA's requirement to take a "hard look" at reasonable alternatives because it considered "only" four alternatives. Second, NPS failed to consider non-deer factors that could also negatively affect the vegetation and thus the EIS was arbitrary and capricious.

The Plan at issue here was the subject of a previous challenge which was also heard by this Court and in which the defendants' motion for summary judgment was granted. *See Friends*

*of Animals v. Fellner,* 16-CV-6006 ("*Friends of Animals*").[2] Regarding the NPS's consideration of four alternatives, the Court found that "a reasonable range of alternatives" was presented, and that those alternatives "were thoroughly explored and objectively evaluated such that a reasoned and intelligent choice could be made by NPS." *See Friends of Animals* at 47. Plaintiffs here restate the argument that NPS' consideration of "only" four alternatives means that it failed to satisfy NEPA. That issue was squarely before the Court in *Friends of Animals* and was resolved in NPS's favor. Plaintiffs have offered no reason to date why they would be likely to succeed on the merits of an argument already expressly rejected by the Court.

Plaintiffs further argue that NPS's analysis was arbitrary or capricious because it failed to consider factors, other than deer, that impact forest regeneration and vegetation diversity at FINS. They offer a list of such factors including, *inter alia,* the impact of storm surge on vegetative health, disease, competition with invasive species, insects, and soil erosion. Pls. Mem. in Support at 19. They further point to NPS's failure to evaluate "anthropogenic factors" such as over-use of the wilderness by campers and beach users. *Id.* Plaintiffs do not argue that the deer have no impact on vegetation.

NEPA requires that an EIS "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives included in the proposed action." 40 C.F.R. §1502.13. In other words, the purpose and need of a project determines the range of reasonable alternatives to be considered. *See League of Wilderness Defenders-Blue Mountain Diversity Project v. U.S. Forest Serv.,* 689 F.3d 1060, 1069 (9th Cir. 2012) ("[t]he scope of an alternatives analysis depends on the underlying 'purpose and need' specified by the agency for the proposed action."). "An agency's purpose and need statement—by which it defines its objectives—is

---

[2] An appeal of the decision in that case is currently pending before the Second Circuit.

10

sufficient under NEPA and will be upheld by a Court if the statement is reasonable." *Vermonters for a Clean Env't, Inc. v. Madrid,* 73 F. Supp. 3d 417, 426 (D. Vt. 2014) (citing *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 196 (D.C. Cir. 1991)). A court may, however, "reject an agency's statement of purpose and need as 'unreasonably narrow' if the statement 'compels the selection of a particular alternative.'" *Little Traverse Lake Prop. Owners Ass'n v. Nat'l Park Serv.,* 883 F.3d 644, 656 (6th Cir. 2018) (quoting *Theodore Roosevelt Conservation P'ship v. Salazar,* 661 F.3d 66, 73 (D.C. Cir. 2011)); *see also Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1066 (9th Cir. 1998) ("'[a]n agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality.'" (quoting *Busey,* 938 F.2d at 196)).

The Plan here is entitled the *White-tailed Deer Management Plan and Final Environmental Impact Statement*, and has the following stated purpose:

> to develop a deer management strategy for [FINS] that supports protection, preservation, regeneration, and restoration of native vegetation and other natural and cultural resources at the Seashore; and minimizes undesirable human-deer interactions while maintaining a viable population of white-tailed deer within the Seashore. This plan also focuses on promoting public understanding of the complex relationship between deer and Seashore resources, tick-borne diseases, people, and infrastructure.

ROD at 1. The Plan's purpose is clearly the management of the deer population on FINS as a whole, not just to remedy their effect on vegetation. Indeed, only five of the Plan's nine stated objectives pertain to the deer's impact on vegetation. *Id.* at 2-3.

Plaintiffs now argue that NPS failed to consider other causes of vegetation loss on FINS. In doing so, they are effectively challenging the purpose of the Plan, broadening it considerably

11

to a focus on the overall condition of vegetation at FINS and how best to maintain it. Plaintiffs have not properly framed their position, nor have they provided case law that supports an attack on the Plan's purpose. In short, they have not established that their argument regarding NPS's failure to consider other harms to vegetation will prove successful.

    *b. Organic Act violation*

  The NPS was created by the National Park Service Act to "promote and regulate the use of the National Park System . . . to conserve the scenery, natural and historic objects, and wild life" therein and to provide for the enjoyment of the same "in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. §100101(a) (formerly 16 U.S.C. §1). Plaintiffs claim that NPS has contravened this mission in two specific ways.

  First, Plaintiffs acknowledge that as to management of wildlife within the NPS, "[t]he Secretary may provide for the destruction of such animals and plant life as may be detrimental to the use of any System unit," 54 U.S.C. §100752, but claim that NPS has not demonstrated that deer are detrimental to the use of FINS. Against the weight of the EIS and its consideration of the impact of the overabundance of deer on FINS, Plaintiffs states that only 2% of FINS users have complained about the deer, thus demonstrating that deer are not detrimental. Balancing the EIS against one finding of a survey does not satisfy Plaintiffs' burden of establishing a likelihood of success on the merits on this basis.

  Plaintiffs' remaining argument is that sport hunting of wildlife in national parks is forbidden unless allowed in the enabling legislation of the park unit. They acknowledge that the FINS enabling legislation allows the Secretary to permit hunting "in accordance with the laws of New York" and directs that "[a]ny regulations of the Secretary under this section shall be issued

after consultation with the Conservation Department of the State of New York." 16 U.S.C. §459e-4. NPS regulations provide that any hunting must be done through the promulgation of "special regulations," 36 C.F.R. §2.2(b)(2), and if lands are closed to the public during the hunting, the closure must be published as a rulemaking in the Federal Register. 36 C.F.R. §1.5(b). Thus, Plaintiffs conclude, Defendants must promulgate special regulations prior to any hunting at FINS.

The regulations cited by Plaintiffs expressly "shall not be construed to prohibit administrative activities conducted by the [NPS], or its agents, in accordance with approved general management and resource management plans, or in emergency operations involving threats to life, property, or park resources." 36 C.F.R. §1.2(d). The Plan makes a distinction between the types of action that will be implemented to reduce the deer population: "[t]hese actions include sharpshooting, limited capture and euthanasia, and a public hunt (in the Fire Island Wilderness only)." ROD at 5. The proposed upcoming removal operations are not a "public hunt," which is not an option to be used in any event at the William Floyd Estate, but rather a sharpshooting operation to be undertaken by federal employees who are highly qualified firearm experts. As the regulations cited by Plaintiffs are plainly inapplicable to this operation, they have not established that the are likely to succeed on the merits of the claim.[3]

---

[3] The "hunting" contemplated by the regulations is simply not same activity as the proposed removal operation to be undertaken at the William Floyd Estate in February and March of this year, but rather pertains to public hunting. Hunting "may be allowed in park areas where such activity is specifically authorized as a discretionary activity. . . ," 36 C.F.R. §2.2(b)(2), and that "[a]uthorized persons may check hunting and trapping licenses and permits. . . . ," 6 C.F.R. §2.2(f), a clear reference to the licensing required for public hunters. The special regulation about closing lands to the public is inapplicable for the additional reason that the removal operation is planned during the winter while the William Floyd Estate is closed to the public. *See* Press Release FAQ.

2.  Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Bisnews AFE (Thailand) Ltd v. Aspen Research Grp., Ltd,* 437 F. App'x 57, 58 (2d Cir. 2011). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks and citation omitted). As the Supreme Court has observed, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545, 107 S. Ct. 1396, 1404, 94 L. Ed. 2d 542 (1987); *see, e.g., Bair v. Cal. Dep't of Transp.,* No. C 10-04360 WHA, 2011 WL 2650896, at *3 (N.D. Cal. July 6, 2011) (irreparable harm likely where tree removal would "diminish the overall health of the forest," and numerous trees would be damaged and possibly die); *Earth First v. Block,* 569 F. Supp. 415, 422 (D. Or. 1983) (irreparable harm where building a road would "destroy[] a wilderness habitat which cannot be restored"). The nature and quality of injury claimed by Plaintiffs here, however, is not that the government's actions would cause direct, permanent harm to the physical environment, but rather an aesthetic injury resulting from the diminished opportunity to observe and photograph deer at the William Floyd Estate.

It is undisputed that the proposed action at the William Floyd Estate is not intended to completely eliminate the deer population from the property. In cases such as this where Plaintiffs claim an aesthetic harm, and the challenged action would remove some, but not all, of

14

the animals, courts have consistently found that there is no irreparable harm.[4] *See, e.g., Pegasus Equine Guardian Assoc. v. U.S. Army*, No. 17-CV-980, 2018 WL 2760339, at *2 (W.D. La. Mar. 9, 2018) (no irreparable harm for loss of cultural heritage or "use and enjoyment of the landscape" where horses would remain on adjacent land), *adopted by*, No. 17-CV-980, 2018 WL 2745985 (W.D. La. June 7, 2018); *Friends of Animals v. U.S. Bureau of Land Mgmt.*, No. 2:15-CV-00118-CW, 2015 WL 803169, at *4 (D. Utah Feb. 26, 2015) (finding plaintiffs' claim of irreparable harm due to inability to "continue to view, study, and photograph horses . . . they have come to know and enjoy" to be "highly unlikely" since horses would remain after the roundup); *Colo. Wild Horse v. Jewell,* 130 F. Supp. 3d 205, 219 (D.C. Cir. 2015) (no irreparable harm where after removal of some horses, a number would likely remain "to satisfy Plaintiffs' interest in observing and enjoying" the animal population); *In Def. of Animals v. U.S. Dep't of the Interior,* 737 F. Supp. 2d 1125, 1138, (E.D. Cal. 2010) (horses and burros "will still be present after the hunt"); *Fund for Animals v. Mainella*, 294 F.Supp.2d 46, 58 (D.C. Cir. 2003) (no irreparable harm where a planned six-day black bear hunt was "not designed to eradicate or even significantly reduce the black bear population" and thus plaintiffs' "aesthetic, spiritual, and cultural interests in observing, photographing, studying, and appreciating bears" would not be irreparably injured); *Fund for Animals v. Babbitt*, 2 F. Supp. 2d 562, 566 (D. Vt. 1996) (no

---

[4] Courts have found irreparable harm based on a claimed aesthetic injury, but only after determining that there was likelihood of success on the merits in establishing a NEPA violation. *See Friends of Animals v. U.S. Bureau of Land Mgmt.*, No. 3:15-CV-0057-LRH-WGC, 2015 WL 555980, at *4 (D. Nev. Feb. 11, 2015); *Fund for Animals, Inc. v. Espy,* 814 F. Supp. 142 (D.C. Cir. 1993); *see also Fund for Animals v. Norton,* 281 F. Supp. 2d 209, 222 (D.C. Cir. 2003) ("[T]he procedural harm arising from a NEPA violation, is insufficient, *standing alone,* to constitute irreparable harm justifying issuance of a preliminary injunction, [however,] *when combined* with the irreparable aesthetic injuries alleged by plaintiffs, such procedural harm does bolster plaintiffs' case for a preliminary injunction.") (alteration in original, emphasis added)).
.

irreparable harm where plaintiffs "presented virtually no concrete evidence to support their contention that their ability to view or photograph moose will be impaired as a result of the proposed limited hunt" where in fact "the state's moose population continues to increase each year and ... the moose hunts ... only decrease the rate of population growth"). The fact that the number of deer will be reduced is not a basis for a finding of irreparable harm as "there is no enforceable right to observe a particular number of animals." *Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438, 448 (S.D.N.Y. 2010) (internal quotation marks and citation omitted); *see also Friends of Animals v. U.S. Bureau of Land Mgmt.*, 2015 WL 803169, at *4 (having 100 fewer horses "does not constitute a cognizable harm"). A sufficient number of deer will remain to satisfy Plaintiffs' interests in observing, enjoying, and photographing the wildlife, and thus their claim of irreparable harm on this basis fails.

Plaintiffs also argue the opportunity to observe the remaining deer at the William Floyd Estate will be diminished after the operation is conducted. Plaintiffs' affiant implies that the remaining deer will be more skittish and likely to avoid humans. As Plaintiffs have offered no basis for predicting the future behavior of the deer, this contention is pure speculation and cannot support a finding of irreparable harm.

To the extent Plaintiffs suggest some interest in the harm to be visited upon the deer,[5] the Court views that suggestion with some skepticism since Plaintiffs contend that one of the "alternative" plans not properly considered would involve working with the NYSDEC to "liberalize deer hunting opportunities on non-NPS lands, including on private land in FINS, and work with non-federal land agencies . . . to increase hunting of deer on Robert Moses State Park

---

[5] *See* DiLeonardo Decl. at: ¶ 7 ("I strongly oppose the killing of deer): ¶9 (the NPS "should never kill wildlife as a solution to any wildlife management issue"); ¶12 (lethal methods are "cruel, ineffective, and won't solve the perceived problem").

and other non-NPS lands." Pl. Mem. at 17. This alternative suggests that Plaintiffs do not have an issue with deer being killed off-site, an argument that seems inconsistent with the potential emotional harm from the death of any of the deer population at the William Floyd Estate. *See generally W. Watersheds Project v. Salazar*, No. CV 09-159-M-CCL, 2011 WL 882641, at *4 (D. Mont. Mar. 10, 2011) (noting that "the harm threatened to Plaintiffs is inconsistently suffered in that Plaintiffs are not apparently troubled by lethal removals conducted pursuant to treaty hunting or state-licensed hunting. Plaintiffs are apparently troubled by lethal removals only when they are conducted by government officials. Such a showing of irreparable harm is weak and inconsistent."); *Friends of Animals v. Caldwell,* No. 2:09-CV-5349, 2010 WL 4723393, at *2 (E.D. Pa. Nov. 22, 2010) (noting inconsistency in that plaintiffs "cannot suggest that it would be reasonable for the [NPS] to introduce coyotes to 'naturally reduce' the deer population, while also arguing that the current cull (albeit by a different lethal means) is causing irreparable harm by 'removing' particular deer with which they have developed 'special relationships.'").

### 3. Balance of the Equities and Public Interest

In deciding whether to issue a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal quotation marks and citations omitted). Plaintiffs argue that the balance of the hardships and the public interest favor an injunction because they are attempting to force the NPS to comply with its duties under NEPA. Pl. Mem. at 22. As Plaintiffs have failed to establish likelihood of success on their claim of a NEPA violation, however, they are hard pressed to rely on this argument to tip the scales in their favor. Plaintiffs

17

also point to public comments that they interpret as widespread public opposition to lethal control, and urge the Court to maintain the status quo. Plaintiffs' affiant opined that after the exercise of lethal methods, "the surviving deer will respond to the killing by increasing their productivity giving birth to more fawns who will have a higher likelihood of survival." DiLeonardo Decl. at ¶12. Although this statement is completely unsubstantiated, it is also inconsistent with Plaintiffs' argument regarding the need to preserve the status quo. In their favor, Defendants point to the advancement of the Plan's objective in preserving the natural landscape at the William Floyd Estate, and note that the implementation "window of action" will close on March 31, 2019.

The balance of hardships and the public interest weigh in Defendants' favor. The Plan, which was devised to address adverse impacts to lands owned and enjoyed by the public, has already survived one challenge. In addition, the removal operations Plaintiffs seek to enjoin are time sensitive and are to be conducted within a limited time period.

## IV. CONCLUSION

For all the foregoing reasons, Plaintiffs' motion to enforce an agreement between the parties and for a preliminary injunction is denied. The temporary restraining order is dissolved.

**SO ORDERED**.

                                                        /s/
                                              Sandra J. Feuerstein
                                              United States District Judge

Dated: February 26, 2019
       Central Islip, New York