UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ANIMAL WELFARE INSTITUTE and
WILDLIFE PRESERVES, INC.,

                                        Plaintiffs,

                        v.

ALEXCY ROMERO, in his official capacity as
Superintendent of FIRE ISLAND NATIONAL
SEASHORE, and the UNITED STATES NATIONAL
PARK SERVICE, an agency of the United States
Department of the Interior,

                                        Defendants.
----------------------------------------------------------------X

**FILED**
**CLERK**

8/3/2020 11:50 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM & ORDER**
17-CV-6952 (SJF)(ARL)

FEUERSTEIN, District Judge:

Plaintiffs Animal Welfare Institute ("AWI") and Wildlife Preserves, Inc. ("WP") (collectively, "Plaintiffs") commenced this action against the Superintendent of the Fire Island National Seashore Park ("FINS") and the United States National Park Service ("NPS") (collectively "Defendants") raising various claims arising from or concerning the FINS White-Tailed Deer Management Plan and Final Environmental Impact Statement (the "Plan") adopted by the NPS. Currently before the Court is Defendants' motion to dismiss the Amended Complaint in part pursuant to Rule 12(b)(1), (b)(6), and (b)(7), or alternatively for partial summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Motion, Docket Entry ("DE") [28]. Plaintiffs oppose the motion. The motion is granted in part with leave to amend.

## I. BACKGROUND

### A. Factual Background[1]

The following facts are taken from the Amended Complaint ("AC"), DE [17], and are assumed to be true for purposes of this motion. In addition to the allegations in the amended complaint itself, that document is also "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citations omitted) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

#### 1. Conveyance of the Real Property

Plaintiff AWI is a non-profit animal advocacy organization with over 40,000 members, including individuals in New York.  AC ¶1.  Plaintiff WP is a private, non-profit land conservation corporation dedicated to the preservation of natural areas, open space, wildlife and wildlife habitats.  *Id.* ¶2.

On June 29, 1955, WP conveyed pieces of property ("WP Tracts") to non-party Sunken Forest Preserve, Inc.  ("SFPI").   These lands make up a substantial portion of what is known as the Sunken Forest Preserve ("Sunken Forest") within the FINS.  The deed conveying the WP Tracts (the "1955 Deed") contains the following restriction:

> This conveyance is made subject to the express condition and limitation that the premises herein conveyed shall be maintained in their natural state and operated as a preserve for the maintenance of wildlife and its natural habitat undisturbed by hunting; trapping, fishing, or any other activities that might adversely affect the environment or the animal population, and for scientific; and educational purposes incidental to such maintenance and operation.

---

[1] Plaintiff's Fourth Claim for Relief alleging a violation of the Administrative Procedures Act ("APA") related to the National Environmental Policy Act ("NEPA") is not at issue here.  Only facts relevant to the disposition of this motion are set forth herein.

> Should the premises cease to be used solely for the above
> purposes, or should any activities be engaged in thereon that would
> adversely affect the flora or the fauna, then the title of the grantee
> shall cease and determine and shall revert to and vest in the
> grantor, the said reversion and vesting to be automatic and not
> requiring any re-entry.

1955 Deed at 5, Liber 3918, page 433, Declaration of Catherine Pastrikos Kelly ("Kelly Decl.")

Exhibit 2 (emphasis removed).  The habendum clause of the 1955 Deed reads as follows:  "TO

HAVE AND TO HOLD the premises herein granted unto the party of the second part, its

successors and assigns forever, subject to the express condition and limitation hereinabove set

forth."  *Id.* at 6, Liber 3918, page 434 (emphasis in original).

On May 9, 1966, SFPI conveyed the WP Tracts and a separate parcel to the NPS via deed

(the "1966 Deed").  AC ¶29.   The 1966 Deed, which is between SFPI and the United States of

America, states that the conveyance is "expressly made subject" to the following condition:

> That all of the premises hereby conveyed shall always be
> maintained in their natural state and operated solely as a sanctuary
> and preserve for the maintenance of wild life and its natural
> habitat, undisturbed by hunting, trapping, fishing or any other
> activities that might adversely affect the environment or the flora
> or fauna of said premises; and for scientific and educational
> purposes incidental to such maintenance and operation.

1966 Deed , Liber 5955, page 243, Kelly Decl. Ex. 3 at.  SFPI is no longer in operation.  *Id.* ¶30.

2.   The NPS Plan

In June 2011, NPS announced its intent to prepare an environmental impact study for a

plan to manage deer and vegetation at FINS, and in 2014, a draft study was published.  AC ¶¶32-

33.  After a period of public comment, the final study was published on December 31, 2015, *id.,*

¶35, and in April 2016, FINS issued a Record of Decision ("ROD") for the FINS White-Tailed

Deer Management Plan and Final Environmental Impact Statement (the "Plan").  *Id.* ¶37.

Plaintiffs claim that the restrictions in the 1955 Deed and 1966 Deed (collectively, the "deed

3

restrictions") were violated by NPS's authorization of the Plan, which includes plans for Sunken

Forest including  (1) the killing of white-tailed deer by hunters, sharpshooters, or by capture and

euthanasia, and (2) the use of fencing causing deer to be driven out of the fenced-in areas, with

the further proviso that "any deer found within would be killed." *Id.* ¶41.   The killing and

driving deer out of fenced-in areas adversely affects the fauna of the WP tracts, and thus the Plan

violates the deed restrictions resulting in title to the WP Tracts reverting to WP. *Id.* ¶43.

      The Plan contains various provisions specific to Sunken Forest.  It calls for an exclusion

fence to be installed around approximately 44 acres of the Sunken Forest, approximately 29

acres of which will be "within the Sunken Forest Preserve," in order to "protect the majority of

the rare maritime holly forest from deer browse."  ROD at 18, FINS 000020.[2]   Although the

composition of the fence is not set forth, the ROD notes that typically, it will be "a minimum of

8-10 feet high and mesh size will be sufficient to allow most small animals to move freely

through."  *Id*.  Electric fencing will not be used.  *Id*. at 19, FINS 000021.

      "During the construction of the fence, deer will be removed from the fenced area by

driving them out.  Once the fence is completed, any deer found inside the fence will be removed

through direct reduction (sharpshooting or capture and euthanasia)."  ROD at 18, FINS 000020.

Sharpshooting will be performed by "[q]ualified federal employees, contractors, or skilled

volunteers with demonstrated expertise and training in the implementation of successful wildlife

and deer management actions."  *Id*. at 20, FINS 000022.  The Plan also states that as part of the

sharpshooter reduction method, "[t]emporary bait stations could be used to attract deer to safe

removal locations."  *Id*. at 21, FINS 000023.  The Plan contemplates use of the capture and

euthanasia method "where sharpshooting would not be appropriate due to safety or security

concerns" and is expected to be used minimally – on 15% or less of the total number of deer

---

[2] References to "FINS 00xxxx" are citations to the Administrative Record.

removed.  *Id*. at 21-22, FINS 000023-24.  Most of the capture methods use bait to attract deer to

a location where tranquilizer darts may be used.  *Id*. at 22, FINS 000024.  No specific locations

are designated for either of the reduction methods.  No public hunting is proposed for Sunken

Forest as the Plan states that to the extent that public hunting is permitted, it will only take place

in the Fire Island Wilderness.  *Id*.

On February 3, 2016, WP wrote to K. Christopher Soller, Superintendent of FINS,[3]

expressing concern about the Plan and "informing NPS that the Plan violates the deed

restrictions."  AC ¶44.   Having received no response, WP wrote to the Regional Director of NPS

on two occasions in May and June 2016 informing NPS of the violation of the deed restrictions

and seeking NPS's cooperation in an effort to avoid litigation.  *Id.* ¶¶45, 46.  On September 1,

2016, Soller wrote to WP and "acknowledged that the WP Tracts carry the deed restrictions

'originated by Wildlife Preserves.'"  *Id.* ¶47.   Soller took the position that there was no violation

of the deed restrictions, noting that in light of the lack of natural predators on Fire Island, deer

numbers have "grown exponentially" resulting in "heavy browsing that is adversely affecting the

flora and fauna of the Sunken Forest" and concluding that management of the deer herd "is a key

factor to ensuring the preservation of the Sunken Forest as a globally-rare ecosystem and as a

preserve for all wildlife and the natural habitat."  *Id.* ¶47.   According to the Amended

Complaint, Soller's reasoning was that it was acceptable to reduce the number of deer, "even in

violation of the deed restrictions—in order to keep the deer population under control."  *Id.* ¶48.

This reasoning specifically violates the deed restriction as "Defendants' actions clearly disturb

---

[3] K. Christopher Soller was originally named as a defendant in his official capacity as Superintendent of FINS at the time the case was commenced.  Since his departure from the position, the named superintendent has been changed twice, leading to substitutions of the party pursuant to Rule 25(d).  Kelly Fellner was substituted on May 16, 2018, and Alexcy Romero on February 21, 2019.

the natural state of the land and adversely affect the animal population by a specific act prohibited in the deed—hunting." *Id.* ¶49.

## B. Prior Litigation

In 1988, various plaintiffs, including WP, commenced an action against, *inter alia,* the Secretary of the U.S. Department of the Interior, seeking relief including an injunction against proposed public hunts of deer in the FINS in December 1988 and January 1989. *Allen v. Hodel,* No. 88 CV 3901, 1989 WL 8143, at *1 (E.D.N.Y. Jan. 11, 1989). The title to Sunken Forest was not raised as a claim in the *Allen* complaint. Although the locations for the planned hunt originally included Sunken Forest, the government decided to remove that area from the proposed hunting grounds. The court's order reflected this decision, noting that "[t]he Sunken Forest area, which involves a question of reverter to private ownership if hunting is permitted, is not involved in any way in the proposed hunts." *Id.* at *7. NPS did conduct a limited deer hunt on part of the FINS in December 1988 and January 1989.

In 2016, an action was commenced before this Court by Friends of Animals, a nonprofit animal rights advocacy organization, challenging the validity of the same Plan at issue in this case. Friends of Animals claimed that the NPS did not comply with the requirements of NEPA and that the Plan was arbitrary and capricious for, *inter alia,* failing to consider alternatives in violation of NEPA. This Court found in favor of Defendants in that case, holding that NPS complied with NEPA, and subsequent to completion of the briefing of the instant motion, the Second Circuit affirmed that decision. *See Friends of Animals v. Fellner,* No. CV 16-6006, DE [49] (E.D.N.Y. July 24, 2018), *aff'd sub nom. Friends of Animals v. Romero,* 948 F.3d 579 (2d Cir. 2020).

## C. Procedural History

Plaintiffs commenced this action on November 29, 2017, and filed an Amended Complaint on April 10, 2018.  The Amended Complaint asserts five claims, four of which are the subject of the instant motion.  The first three claims (collectively, the "title claims") concern title to the WP Tracts:  (a) First Claim for declaratory judgment that the Plan violates the deed restrictions and that the WP tracts immediately revert to Wildlife Preserves; (b) Second Claim for ejectment to recover possession of real property; and (c) Third Claim for permanent injunction.  The Fifth Claim alleges violation of the NPS Organic Act and its implementing regulations.  The Fourth Claim, which is not addressed in this motion, alleges that the NPS failed to consider all reasonable alternatives to lethal population control in violation of NEPA.[4]

In February 2019, Plaintiffs sought a preliminary injunction preventing the culling of deer at the William Floyd Estate portion of FINS.  Hunting on Sunken Forest was not at issue on that motion.  The motion was denied.  *See* Order of Feb. 26, 2019, DE [45],  2019 WL 959675.

Defendants move to dismiss the First, Second, Third, and Fifth Claims, arguing that, *inter alia,* this Court lacks subject matter jurisdiction under the Quiet Title Act ("QTA"), 28 U.S.C. §2409a, Plaintiffs have failed to join the United States as a necessary party, the claims are time-barred or foreclosed by res judicata and collateral estoppel, and the amended complaint fails to state a claim.

---

[4] Although Defendants did not seek to dismiss this claim, they did "reserve the right" to argue that it is barred by res judicata and collateral estoppel in light of the *Friends of Animals* decision.  Memorandum of Law in Support ("Defs. Mem.") at 2, n.3, DE [29].  Plaintiffs acknowledge this statement in their opposition and respond that their claims "under NEPA here are different and broader than those raised by Friends of Animals." Memorandum in Opposition ("Pls. Opp.") at 9, n.2, DE [31].  This Court takes no position on the viablity of Plaintiffs' Fourth Claim in light of the Second Circuit's decision in *Friends of Animals.*

## II.  LEGAL STANDARDS

Under Rule 12(b)(1), a case is "properly dismissed for lack of subject matter jurisdiction

. . . when the district court lacks the statutory or constitutional power to adjudicate it."

*Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000).  The court "must take all

uncontroverted facts in the complaint...as true, and draw all reasonable inferences in favor of the

party asserting jurisdiction."  *Tandon v. Captain's Cove Marina of Bridgeport, Inc.,* 752 F.3d

239, 243 (2d. Cir. 2014).  It is well established, however, that "'[w]here jurisdictional facts are

placed in dispute, the court has the power and obligation to decide issues of fact by reference to

evidence outside the pleadings, such as affidavits.'"  *Id.* (internal quotation marks and citation

omitted); *see also Amidax Trading Grp.  v. S.W.I.F.T. SCRL,* 671 F.3d 140, 145 (2d Cir. 2011)

(where a Rule 12(b)(1) motion "place[s]  jurisdictional facts in dispute . . . the district court

properly considered evidence outside the pleadings"); *Moser v. Pollin,* 294 F.3d 335, 339 (2d

Cir. 2002) (where subject matter jurisdiction is challenged, the court is "free to consider

materials extrinsic to the complaint").  Plaintiff, as the party invoking the court's jurisdiction,

bears the burden to "prove the existence of subject matter jurisdiction by a preponderance of the

evidence."  *Moser,* 294 F.3d at 339.

The standards for analyzing a motion to dismiss pursuant to Rule 12(b)(6) are well-

established.  The court must accept the factual allegations in the complaints as true and draw all

reasonable inferences in favor of the plaintiff.  *Lundy v. Catholic Health Sys. of Long Island Inc.*,

711 F.3d 106, 113 (2d Cir. 2013) (citations omitted).  The court determines "whether the 'well-

pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'"

*Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662,

679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).  Dismissal is warranted when the complaint

fails to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).   Unlike a motion under Rule 12(b)(1), "the movant bears the burden on a motion to dismiss under [Rule] 12(b)(6)." *Four K. Grp. v. NYCTL 2008-A Trust,* Nos. 12-CV-2135, 12-CV-3172, 2013 WL 1562227, at *4 (E.D.N.Y. Apr. 15, 2013).   In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court may consider any documents attached to the complaint and statements or documents incorporated into the complaint by reference.   Consideration of additional materials outside the complaint is permitted when documents are "integral" to the complaint such that "the complaint relies heavily upon its terms and effect." *Goel v. Bunge, Ltd.,* 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Chambers,* 282 F.3d at 153).   Even where a document is integral to the complaint, it may only be considered if it is "clear on the record that no dispute exists regarding authenticity or accuracy of the document" and that "there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir. 2006) (citation omitted).   Courts may also consider "matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing the suit." *Chambers,* 282 F.3d at 153 (ellipsis, internal quotation marks, and citation omitted).

The basis for a motion to dismiss under Rule 12(b)(7) is the failure to join a necessary party under Rule 19.   Rule 19 establishes a two-part test for determining whether an action must be dismissed.   "First, the court must determine whether an absent party belongs in the suit, *i.e.,* whether the party qualifies as a 'necessary party' under Rule 19(a)." *Viacom Int'l Inc. v. Kearney,* 212 F.3d 721, 724 (2d Cir. 2000).   If the party is not necessary, then further analysis under Rule 19(b) need not be conducted. *Id.*   If the party is necessary under Rule 19(a), the court

9

must make the determination of whether joinder of the absent party is feasible.  If joinder is not feasible, "the court must finally determine whether the party is 'indispensable,'" and upon such a finding, the action must be dismissed.  *Id.* at 725; *see* FED. R. CIV. P. 19(b).

Various materials have been presented to the Court on this motion.  While the amended complaint does not directly attach any documents, it incorporates by reference documents that are integral to the allegations including: the 1955 Deed; the 1966 Deed; the Draft Environmental Impact Statement ("DEIS") for the White-tailed Deer Management Plan for FINS; the Final White-Tailed Deer Management Plan and Environmental Impact Statement ("FEIS"); and the ROD (collectively with the FEIS, the "Plan").  Both parties have submitted additional extrinsic materials as part of their motion papers.  *See* Declaration of James H. Knapp ("Knapp Decl."), DE [30]; Kelly Decl., DE [32].  Defendants have filed the entire Administrative Record, *see* DE [21], and both parties have submitted excerpts from the administrative record on which they have relied in their papers.  *See* Kelly Decl., Ex. 1; Defendants' excerpts, DE [34].  In addition, both parties have submitted materials from the *Allen* case, including transcripts of court proceedings.  *See* Knapp Decl., Ex. A-G; Kelly Decl., Ex. 4-5, 7-8.  No party has disputed the accuracy or authenticity of any of these materials and the Court has considered them, to the limited extent indicated below, in making the determinations herein.

## III.  DISCUSSION

### A.  Claims Under the Quiet Title Act

1. Failure to Name the United States as a Party

Defendants move to dismiss the title claims of the amended complaint pursuant to Rule 12(b)(7) for failure to join the United States as a party as required by Rule 19.  Rule 19(a) provides that an absent party should be joined, if feasible, where:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

    (i)    as a practical matter impair or impede the person's ability to protect the interest; or

    (ii)    leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

FED. R. CIV. P. 19(A).

Despite Plaintiffs' allegation that SFPI conveyed the property to the NPS, *see* AC ¶24, the 1966 Deed clearly shows that it was in fact conveyed to the United States. *See* 1966 Deed. The property conveyed to the United States by the 1966 Deed included the WP Tracts, and the title claims in this action all concern WP's reversionary interest in the WP Tracts. Unsurprisingly, Plaintiffs have provided no support for an argument that the titleholder to a property is not a necessary party to an action that would potentially divest that titleholder of its rights in the property.

Plaintiffs' argument is primarily rooted in the "permissive" language of the QTA that "[t]he United States *may* be named a party in any civil action brought by any person to quiet title to lands claimed by the United States." 28 U.S.C. §2409a(a) (emphasis supplied). They have not, however, cited a single case where a federal agency was deemed a proper party under the QTA. To the contrary, the case law firmly establishes that the United States is the proper defendant in an action pursuant to the QTA. *See Sawtooth Mountain Ranch LLC v. United States,* No. 19-CV-00118, 2020 WL 184576, at *8 (D. Idaho Jan. 13, 2020) (the United States is the proper defendant under the QTA and "courts have recognized the United States as an indispensable party under the QTA"); *Schema v. U.S. Dep't of Agriculture,* No. 2:14-cv-0630, 2015 WL 367655, at * (E.D. Cal. Jan. 27, 2015) ("it is well-established that the United States is the only proper defendant subject to a QTA claim"); *Petroff v. Schafer,* No. CV08-1971, 2009

WL 891024, at *1 (D. Ariz. Apr. 1, 2009) ("The proper Defendant in this case [pursuant to the QTA] is the United States rather than the Forest Service Defendants").  Defendants' motion to dismiss pursuant to Rule 12(b)(7) is granted.

Defendants further urge dismissal of the title claims in light of the amended complaint's failure to cite the proper statute supporting subject matter jurisdiction over those claims.  While the QTA provides the exclusive remedy in an action to quiet title to real property in which the United States claims an interest, jurisdiction is conferred by 28 U.S.C. §1346(f) which states that "the district courts shall have exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States."  The amended complaint alleges various statutory bases for jurisdiction including 28 U.S.C. §§2409-10 *et seq*., AC ¶5, but does not expressly reference §1346(f).   Plaintiffs argue *inter alia,* that the factual allegations of the amended complaint sufficiently allege a basis for this Court's exercise of jurisdiction under §1346(f).  Pls. Opp. at 12.  Plaintiffs' failure to cite the correct statute is easily cured upon amendment of the pleadings.

2.  Dismissal of Equitable Remedies

Defendants also seek dismissal of the title claims to the extent they seek equitable relief, arguing that the relief sought is not available under the QTA's limited waiver of sovereign immunity.  The QTA directs that:

> The United States shall not be disturbed in possession or control of any real property involved in any action under this section pending a final judgment or decree, the conclusion of any appeal therefrom, and sixty days; and if the final determination shall be adverse to the United States, the United States nevertheless may retain possession or control of the real property or any part thereof as it may elect, upon payment of . . . of an amount. . . which the district court . . . shall determine to be just compensation for such possession or control.

28 U.S.C. §2409a(b).  The QTA further provides that "[n]o preliminary injunction shall issue in any action brought under this section."  *Id.* §2409a(c).  Plaintiffs argue that the QTA offers an option, since the statute states that the United States  "may" retain possession and elect to pay, and thus "a reversion of ownership is still a possibility if the United States so chooses."  Pls. Opp. at 19.

The Court agrees that the statute does not, on its face, address a situation in which the United States retains possession or control of property after a determination adverse to it, but declines to pay the court-determined amount of compensation.  Thus while it is clear that the relief sought by Plaintiffs is unavailable in the first instance, it cannot be said at this juncture that they may be barred from seeking it at some future time.[5]  Accordingly, the motion to dismiss the claims on this basis is denied.

### 3.  Leave to Amend

Plaintiffs have requested leave to further amend their complaint should the Court dismiss their claims for failure to name the United States as a defendant.  Defendants oppose any further amendment, asserting that any attempt would be futile because, *inter alia,* their claims under the QTA are time-barred.  As it currently cannot be determined whether the claims are timely, Defendants' futility argument is rejected.

The Quiet Title Act provides the exclusive remedy for a claimant challenging the United States' title to real property.  *See Block v. North Dakota*, 461 U.S. 273, 286, 103 S. Ct. 1811, 75 L. Ed. 2d 840 (1983).  It acts as a limited waiver of the United States' sovereign immunity,  28 U.S.C. §2409a(a), and requires a claimant to bring an action "within twelve years of the date upon which it accrued."  *Id.* §2409a(g).  A claim accrues "on the date the plaintiff or his

---

[5] The Court declines to speculate regarding what remedy, if any, may eventually become available to Plaintiffs.

13

predecessor in interest knew or should have known of the claim of the United States." *Id.*  The

Supreme Court has twice concluded that, because the statute of limitations circumscribes the

scope of the QTA's waiver of sovereign immunity, compliance with the limitations period is

jurisdictional." *F.E.B. Corp. v. United States,* 818 F.3d 681, (11th Cir. 2016) (citing *United*

*States v. Mottaz,* 476 U.S. 834, 841, 106 S. Ct. 2224, 90 L. Ed. 2d 841 (1986); *Block,* 461 U.S. at

292); *see also Kingman Reef Atoll Investments, LLC v. United States,* 541 F.3d 1189, 1197 (9th

Cir. 2008) (QTA statute of limitations is jurisdictional); *Bank One Texas v. United States,* 157

F.3d 397, (5th Cir. 1998) (construing grant of summary judgment "as a dismissal for lack of

subject matter jurisdiction because of the jurisdictional nature of QTA limitations"); *but see*

*Wisconsin Valley Imp. Co. v. United States,* 569 F.3d 331, 332 (7th Cir. 2009) (sovereign

immunity "is not a jurisdictional doctrine").  "[A]lthough we should not construe such a time-bar

provision unduly restrictively, we must be careful not to interpret it in a manner that would

extend the waiver [of sovereign immunity] beyond that which Congress intended." *Block,* 461

U.S. at 287 (internal quotation marks and citation omitted).

 Defendants claim that amendment is futile because the QTA claims are time-barred, an

issue addressed by the parties in their papers.  Separately, the papers submitted address

Defendants' additional argument that currently, there is no viable claim under the QTA because

the United States has not yet taken any action that would trigger WP's reversionary interest and

thus the title is not in dispute.  Examination of these arguments reveals a flaw in reasoning

stemming from the nature of WP's reversionary interest in the property.

 Defendants argue that Plaintiffs do not have a viable claim under the QTA, because title

to the property is not in dispute.  They state that to the extent the 1955 Deed is valid and

enforceable, the deed restrictions therein require that the prohibited activity "must be ongoing for

reversion to occur." Defs. Mem. at 30.  Since Defendants have not implemented any of the allegedly violative acts authorized by the Plan, "the event on which reverter is predicated has not occurred" and title has not reverted.  *Id.*  As a result, they contend, title to the WP Tracts is not yet in dispute and there can be no claim under the QTA.  Plaintiffs counter that title is in dispute because "enactment of the Plan represents NPS's final agency action, which is sufficient to give rise to a title dispute."  Pls. Opp. at 13.   The contested issue on this point is what conduct actually triggers the reverter.

As set forth in the QTA, the statue of limitations arguments presented by the parties take a different tack, focusing upon when WP's claim accrued by discussing when WP knew or should have known that the United States took actions indicating that it would, or could, take certain future steps that would violate the deed restrictions.   Both sides suggest dates for accrual of the statute of limitations of WP's claim.  The common element of the dates is that they represent points at which the United States took some action that suggested, implied, or otherwise signaled its *intention or ability* to take future action that would allegedly violate the deed restrictions.   These expressions of intent by the United States differ in character and specificity, ranging from, *inter alia,* a general statutory provision from 1964 stating that hunting would be permitted on FINS without specific reference to Sunken Forest, to a publicized plan in 1988 to allow hunting at Sunken Forest that was subsequently withdrawn before implementation, to the adoption in 2016 of a formal Plan that includes detailed steps for the management of the wildlife population at Sunken Forest.

The parties treat the statute of limitations accrual date and the date the title is disputed as two distinct events, but where the claimed title dispute is created by operation of a reversionary interest, logic dictates that the statute of limitations accrues at the same time.  The QTA provides that the statute of limitations begins to run on the date the plaintiff knew or should have known of the claim, i.e, the reverter, not of the United States' intention to take actions that might ultimately lead to a claim.  Allowing a claim to accrue based only on a threat of future conduct creates the possibility that an interest-holder could be deprived of its interest without any recourse.   For example, the United States could (1) threaten some action that might cause the reverter sometime in the future, thereby accruing the interest-holder's QTA claim for statute of limitations purposes, (2) wait twelve years for the statute of limitations to run, and (3) only then actually perform the restricted act.  In this scenario, the interest-holder would be foreclosed from protecting its interest since it would be unable to commence an action based solely on the United States' representation of future action, and by the time the United States took the action that put the title in dispute, the statute of limitations would have already run on the claim.   Clearly, the QTA is available to decide title issues regarding property interests held by the United States that may arise in any number of different circumstances.  Given the nature of the reversionary interest, the only rational interpretation of the QTA is that the conduct that triggers the reverter places the title in dispute and simultaneously commences the running of the statute of limitations.

Thus, the key question to be answered here is when, if ever, under New York law, was WP's reversionary interest in the property triggered?  Plaintiffs allege that the reversionary interest set forth in the 1955 Deed was triggered by the Plan's authorization for (1) the killing of deer by hunters, sharpshooters, or through capture and euthanasia, and (2) the construction of

fencing "in which deer would be driven out of the fenced-in area and any deer found within would be killed." AC ¶41. These activities violate the deed restriction as they would "adversely affect the flora or the fauna." *Id.* ¶¶42-43 (quoting 1955 Deed). Whether the reversionary interest was triggered on either basis cannot be answered on the current record on Defendants' motion to dismiss.[6]

As to the violation attributable to hunting, there are several references throughout the evidence presented to hunts taking place on FINS.[7] It appears to be undisputed, however that since the WP Tracts were conveyed to the United States, no hunting has ever taken place within Sunken Forest itself. Deer hunting, including a proposed hunt at Sunken Forest, was the basis for the *Allen* litigation in 1988, but Plaintiffs acknowledge that while that hunt "originally included the WP Tracts, NPS removed the WP Tracts from the hunt prior to commencement after WP reminded NPS of the Deed restrictions." Pls. Opp. at 24.

As to the planned construction of fencing, Defendants argue that Plaintiffs knew or should have known that fencing had already been erected on the property in the 1960s, and that they had further notice of prior fencing as the result of testimony adduced by WP's counsel during the *Allen* case in 1988. The 1955 Deed does not mention fencing let alone expressly prohibit it, but rather directs maintenance of the property in its "natural state and operated as a preserve for the maintenance of wildlife and its natural habitat." The evidence presented

---

[6] In addition to the lack of factual evidence available for the Court to review on this motion, the parties have not provided sufficient legal argument regarding the triggering of reversionary interests under New York law.

[7] Defendants point to the Congressional mandate providing that "the Secretary [of the Interior] shall permit hunting . . . within FINS in accordance with the law of New York and the United States of America." 16 U.S.C. § 459e-4. That statute, which applies to the entire FINS and makes no specific mention of Sunken Forest, also states that while hunting shall be permitted, the Secretary may "designate zones where. . . no hunting shall be permitted for reasons of public safety, administration, or public use and enjoyment." *Id.* In 1975, a DEIS was issued and some hunting was allowed, but there is no evidence regarding the scope of the hunting proposed by that document.

regarding fencing goes to whether or not it was used previously at Sunken Forest, a fact that is not, by itself, determinative of the issue of whether such fencing violated the deed restriction requiring the maintenance of the property in a natural state.[8]  A witness in the *Allen* case mentioned "[s]ome of the original sporadic fencing," Transcript of 12/19/88, Knapp Decl. Ex. G, with no further elucidation regarding where or when the fence was built, what its purpose was, and the extent to which, if any, it affected wildlife on the WP Tracts.  On the current record, it cannot be concluded that the erection of fencing at some point triggered WP's reversionary interest.[9]

The determination of whether WP's reversionary interest has been triggered, and if so, when, is central to this case,[10] and simply cannot be resolved on this motion at this point in this litigation.  The Court has considered Defendants' remaining arguments and finds them to be without merit.  The motion is granted to the extent that the title claims are dismissed for failure to name the United States as a defendant, with leave to amend.

**B.  Fifth Claim – Violation of the NPS Organic Act**

The NPS was created by the National Park Service Act to "promote and regulate the use of the National Park System . . . to conserve the scenery, natural and historic objects, and wild life" therein and to provide for the enjoyment of the same "in such manner and by such means as

---

[8] Defendants have submitted a cooperative agreement between the United States and SFPI executed in 1966 that contemplates erection of a fence "as soon as possible" enclosing  property including Sunken Forest.  *See* Cooperative Agreement, Knapp Decl. Ex. I.  The source of this document is not clearly designated and it is doubtful whether it is reviewable on a Rule 12 motion.  Even if it had been considered, there is nothing indicating that the fence was actually completed or what effect it had on wildlife or the habitat.

[9] Also left unaddressed is the question of whether the building of other structures in Sunken Forest, including a boardwalk, violated the deed restrictions.

[10] For example, if it is established that the reverter has occurred, the timing would impact not only the statute of limitations under the QTA, but would also inform any analysis of whether WP's reversionary interest was extinguished pursuant to §345 of New York's Real Property Law.  *See Bd. of Ed. of Cent. Sch. Dist. No. 1 v. Miles,* 15 N.Y.2d 364, 207 N.E.2d 181, 259 N.Y.S.2d 129 (1965).

will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. §100101(a) (formerly 16 U.S.C. §1). Plaintiffs' fifth claim for relief alleges that NPS's decision to allow lethal methods of controlling the deer population violates the NPS Organic Act and its implementing regulations. AC ¶85. Defendants seek dismissal of this claim for failure to state a claim.

In the "Legal Background" section of their memorandum of law, Defendants summarily state that Plaintiffs' contention that the Plan violates the Organic Act is "without merit as the Plan adheres to and is consistent with both the Organic Act and FINS' enabling legislation." Defs. Mem. at 15. This section of the brief goes on to cite various provisions of the Organic Act, the FINS enabling statute, and the C.F.R. without providing any argument or analysis of the facts presented in this case. This is the lone discussion of the Fifth Claim in Defendants' memorandum of law in support. Plaintiffs' opposition similarly does not inform the issue, stating only that the amended complaint pleads sufficient facts to raise a plausible claim for relief. Pls. Opp. at 30-31. On reply, however, Defendants set forth at length their legal arguments in favor of dismissing Plaintiffs' claim. *See* Defendants' Reply Memorandum at 13-15, DE [33]. As Defendants' arguments were not presented in a manner and time that would allow Plaintiffs an opportunity to meaningfully respond, their arguments were not properly placed before the Court. Accordingly, the motion to dismiss the Fifth Claim is denied.

## IV. CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss the complaint, DE [28], is granted to the limited extent that the Plaintiffs claims arising under the Quiet Title Act are

dismissed for failure to name the United States as a party.  Plaintiffs are granted leave to file a second amended complaint consistent with this opinion no later than September 4, 2020.

**SO ORDERED**.

/s/ *Sandra J. Feuerstein*

Sandra J. Feuerstein
United States District Judge

Dated: Central Islip, New York
      August 3, 2020