# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

—————————————————

№ 17-CV-06952 (RER) (ARL)

—————————————————

ANIMAL WELFARE INSTITUTE, ET AL.

VERSUS

ROMERO, ET AL.

———————————

**MEMORANDUM & ORDER**

February 26, 2024

———————————

**RAMÓN E. REYES, JR., U.S.D.J.:**

Plaintiffs Animal Welfare Institute ("AWI") and Wildlife Preserves, Inc. ("WPI") (together, "Plaintiffs") brought this action against the Superintendent of Fire Island National Seashore ("FINS"), and the United States National Park Service, an agency of the U.S. Department of the Interior ("NPS"), raising various claims, including under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, concerning the Record of Decision ("ROD") finalizing the FINS White-Tailed Deer Management Plan and Final Environmental Impact Statement ("Plan") adopted by NPS. (ECF No. 1 ("Compl.")). Plaintiff AWI is a non-profit animal advocacy organization. (ECF No. 59 ("SAC") ¶ 1). Plaintiff WPI is a non-profit land conservation corporation. (*Id.* ¶ 2).

On August 3, 2020, District Judge Sandra J. Feuerstein granted in part a motion to dismiss Plaintiff's Amended Complaint, but with leave to file a second amended complaint joining as defendant the United States of America ("United States," and together with FINS and NPS, "Defendants"). (ECF No. 49 ("Mem. & Order"); *see generally*

SAC). Plaintiffs filed the Second Amended Complaint on September 22, 2021. (SAC). Now before the Court are Plaintiffs' Motion for Summary Judgment (ECF No. 90 ("Pls Mot.")) and Defendants' Cross-Motion for Summary Judgment (ECF No. 94 ("Defs Cross-Mot.")). After carefully reviewing the record, and for the reasons set forth herein, Plaintiffs' Motion for Summary Judgment is denied, Defendants' Cross-Motion for Summary Judgment is granted, and the case is dismissed.

## **FACTUAL BACKGROUND**[1]

A. <u>Conveyance of Property</u>

This case concerns restrictions on property that were originally created on June 29, 1955, when WPI conveyed via deed four tracts of property ("WP Tracts") to non-party Sunken Forest Preserve, Inc. ("SFPI"). (ECF No. 91 ("Shotwell Decl."), Ex. 1 ("1955 Deed"); ECF No. 90-2 ("Pls 56.1") ¶ 1; ECF No. 109 ("Defs 56.1 Resp.") ¶ 1). The WP Tracts are located in the Sunken Forest Preserve ("Sunken Forest"), a 44-acre piece of land on the FINS. (ECF No. 75-1 ("Defs 56.1") ¶ 9; ECF No. 101-1 ("Pls 56.1 Resp.") ¶ 9). The Sunken Forest is a globally rare habitat of national significance in the Northeastern United States. (Defs 56.1 ¶ 10; Pls 56.1 Resp. ¶ 10). Per Congressional directive,[2] NPS

---

[1] The Court assumes as true, for the purposes of the summary judgment motions, facts taken from the parties' respective Rule 56.1 statements of undisputed facts, declarations, and exhibits. *See Fierro v. Galluci*, No. 06-CV-5189 (JFB) (WDW), 2010 WL 1223122, at *1 (E.D.N.Y. Mar. 24, 2010). In addition, the Court recognizes the filings in prior litigation, described in further detail throughout. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–75 (2d Cir. 1991) (holding that the Court may consider matters of which judicial notice may be taken under Federal Rule of Evidence 201).

[2] On September 11, 1964, Congress enacted 16 U.S.C. § 459e ("FINS enabling legislation"), which mandates that "[t]he Secretary [of the Interior] shall administer and protect the Fire Island National Seashore with the primary aim of conserving the natural resources located there." 16 U.S.C. § 459e-6(a). It further states that "the Sunken Forest Preserve shall be preserved from bay to ocean in as nearly its present state as possible[.]" *Id.* The enabling legislation also states that the Secretary "shall permit hunting, fishing, and shellfishing on lands and waters under his administrative jurisdiction within the Fire Island National Seashore in accordance with the laws of New York and the United States of America, except that the

is responsible for managing FINS and the wildlife thereon, including the Sunken Forest. (Pls 56.1 ¶ 16; Defs 56.1 Resp. ¶ 16).

The 1955 Deed states that the conveyance of the WP Tracts to SFPI is:

> subject to the express condition and limitation that the premises herein conveyed *shall be maintained in their natural state and operated as a preserve for the maintenance of wildlife and its natural habitat undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the animal population*, and for scientific and educational purposes incidental to such maintenance and operation. *Should the premises cease to be used solely for the above purposes, or should any activities be engaged thereon that would adversely affect either the flora or the fauna, then the title of the grantee shall cease and determine and shall revert to and vest in the grantor*, the said reversion and vesting to be automatic and not requiring any re-entry.

(1955 Deed at 5[3] (emphasis added); Pls 56.1 ¶ 2; Defs 56.1 Resp. ¶ 2). This provision created WPI's reversionary interest in the WP Tracts. The 1955 Deed further transfers the property to SFPI, "TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, its successors and assigns forever, <u>subject to the express condition and limitation hereinabove set forth</u>." (*Id.* at 6) (emphasis in original).

On May 9, 1966, SFPI conveyed the WP Tracts, plus an additional parcel of land, to the United States via a deed. (Shotwell Decl., Ex. 2 ("1966 Deed"); Pls 56.1 ¶ 6; Defs 56.1 Resp. ¶ 6). The 1966 Deed states, in relevant part,

> [A]ll of the premises hereby conveyed shall always be maintained in their natural state and operated solely as a sanctuary and preserve for the maintenance of wild life and its natural habitat, undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the flora or fauna of said premises; and for scientific and educational purposes incidental to such maintenance and operation.

---

Secretary may designate zones where, and establish periods when, no hunting shall be permitted for reasons of public safety, administration, or public use and enjoyment." *Id.* § 459e-4.

[3] All page numbers cited refer to the document's ECF-stamped page number, or, where applicable, the PDF page number.

(1966 Deed at 10). In addition, the 1966 Deed states that the conveyance is subject to "[t]he condition, limitation, and *reverter* as contained in [the 1955 Deed]." (*Id.* at 14 (emphasis added)).

As part of the second conveyance, on February 24, 1966, SFPI and NPS entered into a Cooperative Agreement, which was not recorded and was not referenced within the 1966 Deed. (ECF No. 96 ("Knapp Decl."), Ex. G ("Cooperative Agreement"); Pls 56.1 Resp. ¶¶ M, O; ECF No. 102 ("Defs 56.1 Reply") ¶¶ M, O). The Cooperative Agreement provides that,

> to assist the [NPS] in maintaining the property to be conveyed to it under [the Cooperative] Agreement as a sanctuary, the primeval portion of the Sunken Forest and certain additional parts of the Preserve adjacent thereto and in the vicinity thereof shall be fenced as soon as possible with a chain link fence 6 feet high . . . with 3 stands of barbed wire above the same with gates to accommodate pedestrians[.]

(Cooperative Agreement at 4; Defs 56.1 ¶ 15; Pls 56.1 Resp. ¶ 15). WPI contends, and Defendants dispute, that it did not have knowledge of the Cooperative Agreement or the fence constructed pursuant to the Cooperative Agreement until the initiation of this lawsuit. (Pls 56.1 Resp. ¶ L; Defs 56.1 Reply ¶ L).

B. <u>Fencing of the Sunken Forest</u>

The purpose of the fence agreed to in the Cooperative Agreement was to protect the WP Tracts and other deeded lands as a sanctuary to benefit wildlife and protect the ecosystem by restricting visitor access to the lands. (Pls 56.1 Resp. ¶ Q; Defs 56.1 Reply ¶ Q). In late-1966 and early-1967, NPS corresponded with FINS officials and SFPI regarding the fence's construction. (Pls 56.1 Resp. ¶ P; Defs 56.1 Reply ¶ P). WPI was not privy to the correspondence. (*Id.*). On December 1, 1966, FINS Acting Superintendent Robert Branges ("Branges") sent a memorandum to the NPS Regional Director,

4

Northeast Region, regarding fencing in the Sunken Forest. (ECF No. 101-2 ("Supp. Shotwell Decl."), Ex. 7). The letter states, in part,

> we advocate that there not be a complete enclosure; rather the open end would be near Sailors Haven where protection by personnel is available. This also permits freer access by deer and fox who would otherwise be impounded or excluded with possible detrimental results. The five foot fence, even with barbed wire strands on top, is not a guaranteed deterrent to humans which argues further for a lesser stand on complete encirclement of whatever we plan to enclose.

(*Id.* at 64).

The NPS Regional Director conveyed a similar position to James Dunlop ("Dunlop"), President of SFPI, in a letter dated December 6, 1966. (Supp. Shotwell Decl., Ex. 8). The letter states, in part,

> we advocate that there not be a complete enclosure. Rather, the open end would be near Sailors Haven where protection by National Park Service personnel is available. This also permits freer access by deer and fox who would otherwise be impounded or excluded from the area with possible detrimental results . . . [I] ask that you and members of the Sunken Forest Preserve, Inc. Board of Directors seriously consider completing the fence in the manner suggested above.

(*Id.* at 67).

On April 27, 1967, FINS Superintendent Henry Schmidt ("Schmidt"), stated in a letter to Dunlop,

> we have continued the fence eastward from the west line of the Sunken Forest, and are enclosing the larger areas . . . . The decision to do this is two fold. First, in order to enclose the area with a fence on the west boundary of the Sunken Forest Preserve Property, it would have been necessary to cut and clear an eight foot swatch through some very fine trees and natural cover. We did not want to do this, and I am sure that you and your people would not have wanted the trees cut. Second, by enclosing the larger area we included additional fine natural environment which can be better protected by the fence . . . . We are all well aware that the Sunken Forest is to remain as a natural sanctuary and because of this, we must provide the best protection possible.

(Supp. Shotwell Decl., Ex. 9). Schmidt noted that the project was nearing completion. (*Id.* at 69).

NPS completed the remainder of the construction of the fence in 1967, and sections of it remained in The Sunken Forest into the late 1980s. (Defs 56.1 ¶ 16; Pls 56.1 Resp. ¶ 16; Knapp Decl., Ex. E at 12:8–19).

C. Prior Litigation

In 1988, various parties, including WPI, brought suit against NPS and others seeking, in part, to enjoin a proposed experimental research hunt on FINS in December 1988 and January 1989. *Allen v. Hodel*, No. 88-CV-3901 (TPC) (ASC), 1989 WL 8143, at *1 (E.D.N.Y. Jan. 11, 1989). The plaintiffs' causes of action included the failure to comply with preliminary rulemaking procedures, failure to take measures to adequately protect the public, negligently planning the proposed hunt, and others. *Id.*[4] Although the Sunken Forest was initially among the areas of FINS on which the experimental hunt was to be conducted, it was excluded from the hunt during the pendency of the *Allen* litigation. *Allen*, 1989 WL 8143, at *7 ("[t]he Sunken Forest area, which involves a question of reverter to private ownership if hunting is permitted, is not involved in any way in the proposed hunts"). FINS Superintendent Noel J. Pachta ("Pachta") confirmed as much in testimony taken during a hearing in *Allen* on December 16, 1988, the day before the hunt began:

> THE COURT: Sunken Forest area, which says the land reverts to private land if hunting is permitted.
> MR. PACHTA: Yes.
> THE COURT: Which may create a problem of losing the land if hunting is permitted.
> MR. PACHTA: Yes, I understand that.

---

[4] The *Allen* plaintiffs, including WPI, did not allege a cause of action under the Quiet Title Act, 28 U.S.C. § 2409a. *See Allen*, 1989 WL 8143, at *1; (*see also* Defs 56.1 ¶ 33; Pls 56.1 Resp. ¶ 33).

THE COURT: Well, that puts another complexion on the case.

MR. PACHTA: Except that, on advise [sic] of my counsel today I removed that section from the hunt.

THE COURT: This section?

MR. PACHTA: Yes. There will be no hunting of animals in that Sunken Forest area.

THE COURT: This is the area that Robert L. Perkins, Junior, head of the Wild Life [sic] Preserves Inc. donated?

MR. PACHTA: Yes, sir.

THE COURT: And you have taken all of the Wild Life [sic] Preserves Inc. land out of the hunt?

MR. PACHTA: Yes.

(Supp. Shotwell Decl., Ex. 2 at 17:1–19). The WP Tracts were excluded from the hunt after WPI alerted FINS officials, several days before the hunt was set to begin, of WPI's automatic reverter if hunting were to occur on the WP Tracts. (*See* Supp. Shotwell Decl., Ex. 3 at 21:1–9). During another hearing in *Allen*, on December 19, 1988, Pachta testified: "That's why as I very often do when I get threatening letters from attorneys in making promises, that information is conveyed to my regional solicitor who at that point through discussion—then we made a decision to remove that portion of Sunken Forest for right now." (*Id.* at 21:22–22:7).

Fencing of the Sunken Forest was discussed during the same hearing. (*See id.* at 28:11–19). In particular, in response to a question posed by then-counsel for WPI, Edward Hochman ("Hochman"), as to "the exact boundaries" of the "particular parcel of [The Sunken Forest] land donated" by WPI, Pachta testified, "[s]ome of the original sporadic fencing has been removed. We, in fact, treat that, the whole area from the Sailor's Haven Visitors Center to the boundary of Oaklyville [sic] and Point of Woods, we treated that whole area as the Sunken Forest which includes, certainly, the area that was donated." (*Id.*). Following this testimony, Hochman presented Pachta with a copy of the

1955 Deed's reversion provision, and then continued to question Pachta about the boundaries of the hunt. (*See id.* at 28:20–31:10).

Ultimately, in *Allen*, the court upheld NPS's authority to conduct the experimental research hunt on FINS, not including the Sunken Forest area. *See Allen*, 1989 WL 8143, at *10.

D. The NPS Plan

In the mid-1980's, "researchers documented a significant decline in plant species and abundance of the Sunken Forest . . . ." (Shotwell Decl., Ex. 9 ("ROD and Plan") at 2). In recent years, scientists observed that many "[vegetation] species have dramatically declined in abundance or have been altogether extirpated from the area by deer browse[.]" (ECF No. 100-2 at 125). Then, on April 28, 2016, NPS issued a ROD finalizing the Plan,[5] the purpose of which is to promote the "protection, preservation, regeneration, and restoration of native vegetation and other natural and cultural resources at the Seashore; and minimize undesirable human-deer interactions while maintaining a viable population of white-tailed deer within the Seashore." (ROD and Plan at 1, 15; Pls 56.1 ¶ 27; Defs 56.1 Resp. ¶ 27). The Plan aims to "address impacts associated with changes in white-tailed deer abundance, distribution, and behavior." (*Id.* at 1, 15). To achieve this, the Plan sets forth management actions that will "utilize a combination of lethal and nonlethal actions to reduce and maintain deer density at a target level[.]" (*Id.* at 5, 17). For the Sunken Forest, the deer density target is set at zero. (*Id.*). Lethal actions to achieve the target density within the Sunken Forest consist of "sharpshooting or capture

---

[5] The Plan is an attachment to the ROD and contains "the complete description of the selected action[.]" (Shotwell Decl., Ex. 9 at 12–67).

and euthanasia." (*Id.* at 5, 19). Once the target deer density is attained via lethal actions it "will be maintained . . . by either direct reduction (sharpshooting, capture and euthanasia[)] . . . or by nonsurgical reproductive control when an acceptable agent becomes available." (*Id.* at 5, 17).[6]

In addition, the Plan includes the "use of exclusion fencing to protect the Sunken Forest maritime holly forest[.]" (*Id.* at 4, 18). The exclusion fence would be "installed around approximately 44 acres of the Sunken Forest to protect the majority of the rare maritime holly forest from deer browse[.]" (*Id.*). "Approximately 29 acres of exclusion fence will be within the Sunken Forest Preserve and approximately 15 acres will be outside the Preserve, extending to the east[.]" (*Id.*). The exclusion fence "will be a minimum of 8 [to] 10 feet high and mesh size will be sufficient to allow most small animals to move freely through the fence[.]" (*Id.* at 7, 18). Pursuant to the ROD and Plan, "[d]uring construction of the fence, deer will be removed from the fenced area by driving them out" and "[o]nce the fence is completed, any deer found inside the fence will be removed through direct reduction (sharpshooting or capture and euthanasia)." (*Id.* at 5, 19).

Installation of the exclusion fence "will result in some adverse impacts on vegetation in the Sunken Forest," given "trimming and removal of some vegetation." (*Id.* at 63). "The extent of linear vegetation removal needed for fence installation totals approximately 1.31 acres in the Sunken Forest[.]" (*Id.*). "To minimize impacts on surrounding vegetation, clearing will be accomplished by hand using hand tools.

---

[6] NPS first announced its intent to prepare an environmental impact statement for a "Deer and Vegetation Management Plan" for FINS on June 17, 2011, via publication of a notice in the Federal Register. (Pls 56.1 ¶ 22; Defs 56.1 Resp. ¶ 22; *see also* Shotwell Decl., Ex. 5). After a period of public comment, the final study was published on December 31, 2015. (Pls 56.1 ¶ 26; Defs 56.1 Resp. ¶ 26; *see also* Shotwell Decl., Ex. 8).

Seashore staff will select alignments for the fence that will minimize removal of overstory trees in the Sunken Forest[.]" (*Id.*). "Vegetation will be allowed to recover along the edge of the fence where construction impacts occurred. Vegetative recovery is expected within one to two growing seasons after fence installation." (*Id.*).

## **PROCEDURAL HISTORY**

Plaintiff commenced this action on November 29, 2017, and filed an Amended Complaint on April 16, 2018. (*See* Compl.; ECF No. 17). On November 20, 2018, Defendants moved to dismiss several claims in the Amended Complaint, arguing that, inter alia, the Court lacked subject matter jurisdiction under the QTA, Plaintiffs failed to join the United States as a necessary party, the claims are time-barred or foreclosed by res judicata and collateral estoppel, and the Amended Complaint failed to state a claim. (*See generally* ECF No. 29). On August 3, 2020, District Judge Sandra J. Feuerstein granted in part Defendants motion to dismiss, holding that Plaintiffs failed to join the United States as a necessary party, but allowed Plaintiffs to file a second amended complaint. (Mem. & Order at 11–12). The Court further held that the question of whether the claims are time-barred could not be resolved on the motion to dismiss. (*Id.* at 17).

On September 22, 2021, Plaintiffs filed the Second Amended Complaint, requesting that the Court (1) issue a declaratory judgment that the Plan violates the deed restrictions and the WP Tracts immediately reverted to WPI as a result of the enactment of the Plan; (2) quiet title in the WP Tracts in favor of Plaintiffs; (3) either (i) eject the United States from the WP Tracts, allow Wildlife Preserves to recover possession of the WP Tracts, and order Defendants to execute a deed for the WP Tracts in favor of Wildlife Preserves, its successors and assigns; or (ii) require the United States to pay just

compensation to Plaintiffs; and (4) rule that the Plan violates the deed restrictions on the WP Tracts and permanently enjoin NPS from executing the Plan on the WP Tracts. (SAC ¶¶ 50–77).

In December 2022 and January 2023, the parties requested a pre-motion conference on their anticipated motions for summary judgment. (*See* ECF Nos. 67, 75, 76, 79). District Judge Nina R. Morrison[7] denied the requests for a pre-motion conference and set a briefing schedule. (Order dated 4/13/2023). On August 31, 2023, the parties filed the fully briefed Motion and Cross-Motion. (*See* Pls Mot.; ECF Nos. 90-1 ("Pls Mem."), 110 ("Defs Opp."), 92 ("Pls Reply"); Defs Cross-Mot., ECF Nos. 95 ("Defs Mem."), 98 ("Pls Opp."), 103 ("Defs Reply")).

## **LEGAL STANDARDS**

I.  <u>Summary Judgment</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to material fact exists if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court must "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in that party's favor." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011) (citing *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010)).

---

[7] After several reassignments, on October 26, 2022, District Judge Nina R. Morrison was assigned to the case. (Ordered dated 10/26/2022). On December 7, 2023, the case was reassigned to me for all further proceedings. (Order dated 12/7/2023).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial." *McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *4 (E.D.N.Y. Apr. 2, 2020) (citing *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009)). To do so, the nonmoving party may not rely on "[a] mere 'scintilla of evidence'" but "'must come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (first quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003), then quoting *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002)); *see also Garcia v. Saigon Mkt. LLC*, No. 15 Civ. 9433 (VSB), 2019 WL 4640260, at *3 (S.D.N.Y. Sept. 24, 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) ("To defeat a summary judgment motion, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'").

To satisfy their respective burdens, the parties may rely upon "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "Where the non-movant will ultimately bear the burden of proof at trial, he must present evidence to support the essential elements of his claims." *Hristova v. 3321 Astoria Inc.*, No. 17-CV-1633 (RER), 2018 WL 4006880, at *3 (E.D.N.Y. June 27, 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Absent evidence supporting the non-movant's claims, judgment should be entered for the moving party." *Id.* But "[i]f

12

the evidence is such that a 'jury could reasonably find for the nonmovant,' the motion must be denied." *Id.* (quoting *Anderson*, 477 U.S. at 252).

II.   <u>The Quiet Title Act</u>

"The QTA authorizes (and so waives the Government's sovereign immunity from) a particular type of action, known as a quiet title suit: a suit by a plaintiff asserting a 'right, title, or interest' in real property that conflicts with a 'right, title, or interest' the United States claims." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). In order for a court to exercise jurisdiction over an action under the QTA, "1) the United States must claim an interest in the property at issue; and 2) there must be a disputed title to real property between interests of the plaintiff and the United States." *Leisnoi, Inc. v. United States*, 267 F.3d 1019, 1023 (9th Cir. 2001). The Supreme Court has held that "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property." *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 (1983).

<b><u>DISCUSSION</u></b>

Claims under the QTA must be brought within a twelve-year statute of limitations: "[a]ny civil action under this section . . . shall be barred unless it is commenced within twelve years of the date upon which it accrued." 28 U.S.C. § 2409a(g). As discussed in further detail herein, WPI's QTA claim falls outside of the twelve-year statute of limitations because its claim to title in the WP Tracts accrued at the latest by 1988. Further, WPI's time-barred QTA claim could not be resurrected by the 2016 ROD and Plan. Consequently, because the underlying QTA claim is untimely, Plaintiffs may not be

awarded declaratory or injunctive relief. Finally, Plaintiffs' claim for ejection is preempted by the QTA.

I.      WPI's QTA Claim is Time-Barred

Under the QTA, an "action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest *knew or should have known* of the claim of the United States." 28 U.S.C. § 2409a(g) (emphasis added); *see also United States v. Beggerly*, 524 U.S. 38, 39 (1998). In the context of WPI's claims,[8] the statute of limitations began to run on the date that WPI knew or should have known that a reversionary interest in the WP Tracts was triggered. The Court previously held that, "[g]iven the nature of the reversionary interest, the only rational interpretation of the QTA is that the conduct that triggers the reverter places the title in dispute and simultaneously commences the running of the statute of limitations." (Mem. & Order at 16). The Court further noted that "[w]hether [WPI's] reversionary interest was triggered . . . cannot be answered on the current record on Defendants' motion to dismiss." (*Id.* at 17). Now, on summary judgment, the Court is tasked with determining when, if ever, WPI's reversionary interest in the WP Tracts was triggered for QTA statute of limitations purposes.

WPI argues that its reversionary interest was triggered on April 28, 2016, when the ROD was issued. (Pls Mem. at 19–23). Specifically, WPI argues that "when NPS issued the ROD requiring enactment of a Plan that mandated lethal deer management and

_____

[8] As an initial matter, AWI is not a proper party to the QTA claim. The Supreme Court has made clear that under the QTA, "adverse claimants" means "plaintiffs who themselves assert a claim to property antagonistic to the [f]ederal [g]overnment's." *Patchak*, 567 U.S. at 215 (holding that plaintiff's claim did not fall under the QTA because the plaintiff himself did not assert title to the disputed land); *see also Call-A-Head Corp. v. United States*, No. 21-CV-3234 (LDH) (VMS), 2022 WL 263164, at *2 (E.D.N.Y. Jan. 27, 2022) (same). AWI has not asserted a claim to title to the WP Tracts. Accordingly, the Court considers the QTA claim only with respect to WPI throughout the remainder of this memorandum.

construction of a wildlife exclusion fence on the WP Tracts, Defendants violated the deed restrictions." (*Id.* at 22). WPI therefore argues that because it brought suit less than two years later, on November 29, 2017, the QTA claim falls well within the twelve-year statute of limitations. (*Id.* at 19). Defendants, on the other hand, argue that WPI's reversionary interest was triggered in 1966 or 1967, when SFPI conveyed the Sunken Forest to the United States with the proviso that the Sunken Forest be enclosed with a chain-link and barbed wire fence, and when the fence was ultimately constructed, or alternatively in 1988 when WPI definitively gained notice thereof. (Defs Mem. at 19–22).[9]

A.  The 1967 Fence Triggered WPI's Reversionary Interest

A threshold question in the Court's inquiry is whether the 1967 fence triggered WPI's reversionary interest for QTA statute of limitations purposes. The Supreme Court has held that "a condition to the waiver of sovereign immunity . . . must be strictly construed." *Wilkins v. United States*, 598 U.S. 152, 162 (2023); *see also Block*, 461 U.S. at 287. As such, "the trigger for starting that twelve-year clock running is an exceedingly light one." *George v. United States*, 672 F.3d 942, 944 (10th Cir. 2012). In the context of the QTA statute of limitations, the Court need not determine whether Defendants' conduct conclusively and unequivocally violated the deed restrictions. *See Shultz v. Dep't of Army*, 886 F.2d 1157, 1160 (9th Cir. 1989). Rather, the relevant inquiry is whether the government took actions that were *adverse* to plaintiff's interest. *See id.*; *see also*

---

[9] Defendants alternatively argue that WPI's reversionary interest was triggered (1) in 1966, when the United States took title to the WP Tracts, because the 1964 FINS enabling act obligated NPS to allow hunting on the WP Tracts (Defs Mem. at 21); (2) in 1975, when NPS issued a final environmental impact statement that "gave notice that the NPS intended to permit deer hunting at FINS per its 'legislative mandate'" (*id.* at 21–22); or (3) in 1988, when NPS conducted a deer hunt within FINS, originally including the Sunken Forest (*id.* at 22). Because the Court finds that WPI's reversionary interest was triggered based on the 1967 fence, the Court does not consider these alternative arguments.

*Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008) ("the [QTA] statute of limitations inquiry is whether the plaintiff had notice of the federal claim, *not whether the claim itself is valid*") (emphasis added). The government's conduct "merely must be substantial enough to create a cloud on title." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 599 F.3d 1165, 1176 (10th Cir. 2010). Further, even "invalid [ ] claims trigger the [QTA] limitations period . . . and the merits of the [ ] claim are not relevant to the limited inquiry[.]" *Graham v. United States*, No. 21-CV-03053 (NYW), 2022 WL 1288477, at *8 (D. Colo. Apr. 29, 2022) (quotation marks omitted).

Here, WPI maintains that the purpose of the 1967 fence was "fully consistent with and advance[d] the purposes of the deed restrictions." (Pls Opp. at 10). Specifically, WPI argues that, unlike the fence mandated by the 2016 ROD and Plan, "[t]here is no evidence that the purpose of the 1967 fence was to exclude wildlife." (*Id.* at 10–11). However, correspondence regarding the fence suggests that the fence did, in fact, exclude wildlife. For example, correspondence makes clear that the fence was ultimately enclosed on all sides, despite the letters advocating against full enclosure. (Supp. Shotwell Decl., Ex. 9 at 69 ("we have continued the fence eastward from the west line of the Sunken Forest, and are enclosing the larger areas")). The correspondence further states that full enclosure would "impound[] or exclude[] [deer and fox] from the area with possible detrimental results." (Supp. Shotwell Decl., Exs. 7 at 64, 8 at 67). WPI itself concedes, in briefing regarding the 2016 ROD and Plan, that "eliminating an entire species from the WP Tracts violates Defendants' obligation to maintain the land in its 'natural state' as a sanctuary and preserve for the maintenance of wildlife.'" (Pls Opp. at 28–29 (quoting 1955 Deed at 5)). WPI further admits that "barring deer and larger species of wildlife from

accessing the WP Tracts" violates the deed restrictions by "adversely affect[ing] the . . . fauna." (Pls Opp. at 29 (quoting 1955 Deed at 5)). The Court is not aware of how, as a practical matter, a fully enclosed, five-foot high, chain-link and barbed-wire fence could have allowed for the free access of deer and larger species of wildlife.

In addition, WPI points to the correspondence regarding the fence to support the argument that the purpose of the 1967 fence was to "protect the WP Tracts as a sanctuary to benefit wildlife and protect the ecosystem by restricting visitors from disturbing the area." (Pls Opp. at 10). But, as WPI rightly points out in briefing regarding the 2016 ROD and Plan, "[Defendants' stated] purpose, need, and objectives do not grant [them] the authority to violate the deed restrictions." (Pls Opp. at 32). The Court finds that the fence did not, in fact, serve the purpose of "maintain[ing] [the WP Tracts] in their *natural* state," as required by the deed restrictions. (*See* 1955 Deed at 5 (emphasis added)). [10] Accordingly, the record makes clear that the 1966 proviso and construction of the 1967 fence are fundamentally at odds with the deed restrictions. The Court therefore finds that the government's conduct was sufficient to trigger WPI's revisionary interest for QTA statute of limitations purposes. [11]

---

[10] WPI further argues that the 1967 fence aligned with the intent of SFPI and the United States, "as neither party would have entered into a cooperative agreement that required a violation of the deed they had recently executed." (Pls Opp. at 11). Given that the 1967 fence did conflict with the deed restrictions, the parties' *intention* in creating the fence is irrelevant.

[11] Defendants alternatively argue that the deed restrictions should not be enforced because they are vague and ambiguous, and, if enforced, would produce unreasonable results. (*See* Defs Mem. at 26–34; Defs Opp. at 28–32). WPI maintains that the deed restrictions are not vague and ambiguous, and are enforceable. (*See* Pls Opp. at 24–28). Ultimately, the Court need not determine whether the deed restrictions are enforceable. Rather, the relevant inquiry for QTA statute of limitations purposes is whether Defendants' action would have reasonably alerted WPI that Defendants' acted adverse to the deed restrictions. *See Shultz*, 886 F.2d at 1160; *see also Kingman Reef Atoll Invs., L.L.C.*, 541 F.3d at 1197.

B. <u>WPI Knew or Should Have Known of the 1967 Fence</u>

Having determined that the 1967 fence triggered WPI's reversionary interest, the Court next considers whether WPI "knew or should have known" that a QTA claim accrued. *See* 28 U.S.C. § 2409a(g). All parties agree that the Cooperative Agreement referencing the fence was not recorded at any point. (Pls 56.1 Resp. ¶¶ M, O; Defs 56.1 Reply ¶¶ M, O). The parties dispute, however, whether WPI had knowledge of the Cooperative Agreement or the fence constructed in connection with the Cooperative Agreement until the initiation of this lawsuit. (Pls 56.1 Resp. ¶ L; Defs 56.1 Reply ¶ L). WPI asserts that it did not have notice of the fence until this litigation, and so the QTA claim did not accrue until the 2016 ROD and Plan. (Pls Opp. at 11). As described in further detail herein, the Court finds that this dispute of fact is not material, as WPI reasonably "should have known" about the fence based on the December 19, 1988 hearing in *Allen*.

Even standing alone, FINS Superintendent Pachta's 1988 testimony that "some" of the fencing around or within the Sunken Forest was removed should have raised WPI's suspicions that a fence had been constructed. (*See* Knapp Decl., Ex. E at 12:8–19; *id.*). The testimony suggests that not only was there a history of fencing around the Sunken Forest, but also that other fencing remained. In that moment, WPI, via its counsel, was put on notice that Defendants may have violated and may still be violating the deed restrictions. *See Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) (where knowledge acquired by counsel was imputed to plaintiff at the time that his counsel received said information). WPI argues that Pachta "never elaborated on what fencing he was referring to, when it was built, why it was built, or whether it was completed." (Pls Reply at 11). But WPI did not need to know "the claim's full contours" in order for the QTA statute of

limitations to accrue. *See Knapp v. United States*, 636 F.2d 279, 283 (10th Cir. 1980).

Nor did WPI need to know "the precise nature" of the government's conduct. *See Rio Grande Silvery Minnow*, 599 F.3d at 1176. Instead, WPI only needed to be "reasonabl[y] aware[]" of a claim to title. *Id.*

Furthermore, the Court cannot view this testimony in a vacuum and must look to the broader context of the litigation. In *Allen*, the Sunken Forest was initially among the areas of FINS on which the experimental hunt was to be conducted, but was excluded from the hunt. *Allen*, 1989 WL 8143, at *7. The exclusion was not a coincidence. Rather, NPS decided to exclude the WP Tracts from the hunt only after WPI informed NPS of the deed restrictions and the possibility of reverter. (*See* Supp. Shotwell Decl., Ex. 3 at 21:1–9, 21:22–22:7). Pachta testified to that affect during the December 19, 1988 hearing, shortly before he testified regarding the 1967 fence. (*Id.*). In addition, directly after Pachta testified regarding the 1967 fence, Hochman presented Pachta with the 1955 Deed's reverter provision and proceeded to ask Pachta questions regarding the hunt. (*Id.* at 28:20–29:16). This context makes clear that one of WPI's interests in the *Allen* litigation was in preventing the deed restrictions from being violated and ensuring that they were not. The deed restrictions were front of mind for WPI, and any potential violation thereof should have been recognized. The Court finds that WPI, as a reasonable party, should have known that a fence surrounding the donated land could conflict with the deed restrictions. Therefore, the QTA claim accrued by 1988, and WPI had, at the latest, until 2001 to bring a timely claim.[12]

---

[12] Defendants argue that WPI's reversionary interest was extinguished between 1993 and 1996, because WPI failed to file a "declaration of intention" to preserve the interest within 27 to 30 years of its creation, as required by New York Real Property Law Section 345 ("RPL 345"). (Defs Opp. at 27–28); *see* N.Y. Real

C. WPI Cannot Resurrect a Time-Barred QTA Claim

Finally with respect to the QTA, the Court must dispel WPI's notion that even if its QTA claim arising from the 1967 fence is time-barred, it is permitted to bring another QTA claim arising from the 2016 ROD and Plan. (Pls Opp. at 8–10). WPI's theory is as follows:

> [I]f the statute of limitations has run due to some previous activity, then that merely precludes a grantor from challenging a grantee's title due to that particular activity. It does not preclude a challenge of future, different activities that trigger a reversionary interest. Assuming, arguendo, that the four activities Defendants cite to did indeed trigger WP's reversionary interest, such that the QTA's statute of limitations began to run, then WP simply would be barred from bringing an action alleging that title to the WP Tracts was in dispute based on construction of a fence in 1967, the Enabling Act, the 1975 [final environmental impact statement], and the 1988 hunt.

(Pls Opp. at 9). But WPI cites no authority for this position, likely because it conflicts with the construction and history of the QTA. Federal sovereign immunity provides that the United States cannot be sued without the consent of Congress. *Block*, 461 U.S. at 287. "A necessary corollary of [federal sovereign immunity] is that when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied." *Id.* In passing the QTA, Congress intended to provide a way for claimants to challenge the United States' title to real property, and thereby created a waiver of sovereign immunity. *Id.* at 286. One "condition" to this legislation is the twelve-year statute of limitations. *Id.* at 287. Accordingly, the Court must take caution "not to interpret [the statute

---

Prop. § 345(1), (4). WPI argues that its reversionary interest was not extinguished for several reasons. (*See* Pls. Opp. at 19–24). Even if WPI's reversionary interest was extinguished between 1993 and 1996, WPI had notice of a QTA claim based on its reversionary interest by 1988, when the interest was still valid. Accordingly, the Court need not consider whether RPL 345 extinguished WPI's interest.

of limitations] in a manner that would 'extend the waiver beyond what Congress intended.'" *Id.* (quoting *United States v. Kubrick*, 444 U.S. 111, 117–118 (1979)).

If WPI's position were correct, "all of the carefully-crafted provisions of the QTA deemed necessary for the protection of the national public interest could be averted. 'It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading.'" *Block*, 461 U.S. at 286 (quoting *Brown v. GSA*, 425 U.S. 820, 833 (1976)). Specifically, if WPI were permitted to resurrect a time-barred QTA claim involving the same disputed title, "the QTA's twelve-year statute of limitations, one point on which the Executive Branch was most insistent, could be avoided[.]" *Id.*

The Supreme Court's decision in *Block* is instructive here. *See id.* There, the Court rejected the state of North Dakota's argument that the QTA statute of limitations did not apply to civil actions brought by states. *See id.* The Court observed that "§ 2409a(f) expressly states that civil action is time-barred unless filed within twelve years after the date it accrued. The statutory language makes *no exception* for civil actions by [s]tates." *Id.* at 288 (emphasis added). The Court held that in light of its approach to sovereign immunity cases, the state was not entitled to an exemption from the QTA's statute of limitations. *See id.* Likewise here, the statutory language of the QTA makes no exception or condition for claimants seeking to resurrect time-barred title disputes due to different government conduct. *See* 28 U.S.C. § 2409a. Rather, the QTA allows a party to "adjudicate a disputed title to real property in which the United States claims an interest" within twelve years of when the United States' claim accrued. *Id.* Here, once WPI knew or should have known that its reversionary interest was triggered, the United States began

holding a claim to title that was adverse to WPI's. Particularly in light of the automatic reverter, the United States continued (and continues) to hold that adverse claim to title. While WPI had a twelve-year window of time to adjudicate that adverse claim, that window is now closed and cannot be reopened. Accordingly, given that WPI's time to bring a claim under the QTA has expired, the WPI is barred from resolving title to the WP Tracts.[13]

\* \* \*

Accordingly, Plaintiffs' Motion for Summary Judgment on the QTA claim is denied, Defendants' Cross Motion for Summary Judgment on the QTA claim is granted, and the QTA claim is dismissed.

II. __Plaintiffs Are Not Entitled to Declaratory and Injunctive Relief__

Plaintiffs assert claims for both declaratory judgment and permanent injunction, both of which are forms of relief and not independent causes of action. (SAC ¶¶ 50–54, 69–77); *see Nat'l Union Fire Ins. Co. v. Karp*, 108 F.3d 17, 21 (2d Cir. 1997) (noting that the Declaratory Judgment Act "is procedural in nature, and merely offers an additional remedy to litigants"); *Roller v. Red Payments L.L.C.*, No. 19-CV-5285 (GRB) (VMS), 2022

---

[13] WPI further argues that barring this action would effectively "extinguish[] a grantor's reversionary interest for failure to bring a claim over past activity" and allow "a grantee [to] violate deed restrictions in a different manner in the future without being subject to legal challenge." (Pls Opp. at 8–9). But the QTA statute of limitations does not extinguish claimants' rights. *Block*, 461 U.S. at 292; *United States v. Gammache*, 713 F.2d 588, 591–92 (10th Cir. 1983). Rather, it bars the QTA as a remedy. *Gammache*, 713 F.2d at 591–92. In other words,

> [a] dismissal pursuant to § 2409a(g) does not quiet title to the property in the United States. The title dispute remains unresolved. Nothing prevents the claimant from continuing to assert his title, in hope of inducing the United States to file its own quiet title suit, in which the matter would finally be put to rest on the merits.

*Block*, 461 U.S. at 292. "Thus, once title has vested, absent eminent domain, title remains with the title holder 'regardless of whether [one's] suit to quiet its title is time-barred under [the QTA].'" *Kane Cnty., Utah (2), (3) & (4) v. United States*, No. 10-CV-01073 (CW), 2023 WL 6609358, at *5 (D. Utah Oct. 10, 2023) (quoting *Block*, 461 U.S. at 292 & n.27). "A vested, but non-perfected property right, still means something." *Id.*

WL 4226094, at *8 (E.D.N.Y. Sept. 12, 2022) ("[I]t is well settled that a request for injunctive relief is not a separate cause of action." (internal citation omitted)). Plaintiffs cannot maintain claims for declaratory and injunctive relief where the underlying substantive claim has been dismissed. *See Prignoli v. Bruczynski*, No. 20-CV-907 (MKB) (VMS), 2021 WL 4443895, at *13 (E.D.N.Y. Sept. 28, 2021) (holding that plaintiff is not entitled to independent declaratory relief where the court dismissed the underlying substantive claims); *Roller*, 2022 WL 4226094, at *8 ("an injunction relies on a valid legal predicate"). Thus, in light of the dismissal of Plaintiffs' underlying QTA claim, Plaintiffs are not entitled to independent declaratory or injunctive relief. Accordingly, Plaintiffs' Motion for Summary Judgment with respect to declaratory and injunctive relief is denied and Defendants' Cross Motion for Summary Judgment with respect to declaratory and injunctive relief is granted.

III.    The QTA Preempts Plaintiffs' Ejectment Claim

Plaintiffs also assert a claim for ejectment. (SAC ¶¶ 62–68). Under New York law, ejectment is an action to recover immediate possession of real property. *City of Syracuse v. Hogan*, 234 N.Y. 457, 462 (1923). To succeed on a claim for ejectment, plaintiff must prove legal title to the real property. *Aubuchon v. New York, N.H. & H.R. Co.*, 137 A.D. 834, 837 (2d Dep't 1910). Here, legal title to the WP Tracts is in dispute. And because the United States claims title to the real property at issue, the QTA is Plaintiffs' "exclusive means" to challenge title. *Block*, 461 U.S. at 286 (1983). Therefore, Plaintiffs are preempted from bringing other causes of action challenging the United States' title to the WP Tracts, including ejectment. See *id.*; *see also Shoshone-Bannock Tribes of the Fort Hall Reservation v. United States of America*, No. 18-CV-00285 (AKB), 2024 WL 249367

(D. Idaho Jan. 22, 2024) (holding that QTA prevented ejectment claim against government officer). As such, Plaintiffs' Motion for Summary Judgment on ejectment is denied, Defendants' Cross Motion for Summary Judgment on ejectment is granted, and the claim for ejectment is dismissed.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment is denied, Defendants' Cross Motion for Summary Judgment is granted, and the case is dismissed.

SO ORDERED.


Hon. Ramón E. Reyes, Jr.  Digitally signed by Hon. Ramón E. Reyes, Jr.
Date: 2024.02.26 14:01:05 -05'00'

RAMÓN E. REYES, JR.
United States District Judge

Dated: February 26, 2024
Brooklyn, NY

24